EXHIBIT "F"

Christoph J. Flaherty, P.E.

```
1           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

                         -  -  -
3

    ALLSTATE INSURANCE     : NO. 2:19-CV-03529
4   COMPANY A/S/O THOMAS    :
    and LISA ELLIS,         :
5                           :
             Plaintiffs,    :
6                           :
    v.                      :
7                           :
    LG ELECTRONICS USA,     :
8   INC.,                   :
                            :
9            Defendant.     :
10                      -  -  -
11           Thursday, January 7, 2021
12                      -  -  -
13           Remote videoconference deposition
14   of CHRISTOPH J. FLAHERTY, P.E., taken
15   pursuant to notice at the location of the
16   witness in Severna Park, Maryland on the
17   above date, beginning at 10:25 a.m.,
18   before Jared E. Bittner, RPR, CSR (NJ).
19                      -  -  -
20
21
22
23       GOLKOW LITIGATION SERVICES, INC.
     (877) 370-3377 / fax (917) 591-5672
24            deps@golkow.com
```

Christoph J. Flaherty, P.E.

```
 1     APPEARANCES:   (Via Zoom)
 2             JOSEPH L. McGLYNN, ESQUIRE
               de Luca Levine
 3             Three Valley Square, Suite 220
               Blue Bell, Pennsylvania 19422
 4             jmcglynn@delucalevine.com
               215-310-4731
 5             Counsel for Plaintiffs
 6             WARREN E. VOTER, ESQUIRE
               Sweeney & Sheehan, P.C.
 7             1515 Market Street, Suite 1900
               Philadelphia, Pennsylvania 19102
 8             warren.voter@sweeneyfirm.com
               215-963-2439
 9             Counsel for Defendant
10                       -  -  -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Christoph J. Flaherty, P.E.

```
 1                    I N D E X
 2   WITNESS:                              PAGE
 3   CHRISTOPH J. FLAHERTY, P.E.
 4         By Mr. Voter            4, 162, 172
 5         By Mr. McGlynn             141, 168
 6                   -  -  -
 7

 8   EXHIBIT          DESCRIPTION          PAGE

     Flaherty-1   11/06/20 Flaherty
 9                Engineering Investigation
                  Report                    85
10
     Flaherty-2   Curriculum Vitae          84
11
     Flaherty-3   Four Page List of Expert
12                Testimony Given by
                  Christoph J. Flaherty, PE 84
13
     Flaherty-4   Photograph                33
14
     Flaherty-5   Printed Document with
15                Dropbox Link
                  (Confidential - Retained) 84
16
     Flaherty-6   Hand-drawn Diagram        111
17
                   -  -  -
18
19
20
21
22
23
24
```

Christoph J. Flaherty, P.E.

```
 1              COURT REPORTER:  All parties

 2      to this deposition are appearing

 3      remotely and have agreed to the

 4      witness being sworn in remotely.

 5      Due to the nature of remote

 6      reporting, please pause briefly

 7      before speaking to ensure all

 8      parties are heard completely.

 9              Counsel, please state your

10      appearance for the record.

11              MR. McGLYNN:  Joseph McGlynn

12      for the plaintiff.

13              MR. VOTER:  Warren Voter for

14      the defendant.

15                   - - -

16              ... CHRISTOPH J. FLAHERTY,

17      P.E., having been duly

18      sworn/affirmed, was examined and

19      testified as follows:

20                   - - -

21              EXAMINATION

22                   - - -

23  BY MR. VOTER:

24      Q.   Okay.  Mr. Flaherty, you've
```

Christoph J. Flaherty, P.E.

1    been deposed before, correct?

2          A.    Yes.

3          Q.    And you know what the

4    procedure is and the rules, correct?

5          A.    Yes.

6          Q.    You don't need me to explain

7    them to you?

8          A.    No, I don't think so.

9          Q.    Okay.  Let me first ask

10   whether you have made available your

11   entire file on this matter for today's

12   deposition.

13         A.    I have.

14         Q.    And is that file contained

15   within the link that Mr. McGlynn sent me,

16   do you know?

17         A.    Yes, that should be the

18   entire file.

19         Q.    Okay.  Has anything been

20   removed from that file before today's

21   deposition?

22         A.    No.

23         Q.    Is there anything that's

24   been added to that file since you wrote

Christoph J. Flaherty, P.E.

1    your report in this matter on November

2    6th, 2020?

3        A.    Yes.

4        Q.    What's been added to the

5    file?

6        A.    The expert reports from Mr.

7    Nemeth and Mr. Smith and their CVs.

8        Q.    Did you issue any new

9    reports since the November 6, 2020,

10   report?

11       A.    No.

12       Q.    Have you created any new

13   documents or materials relating to this

14   case since your November 6, 2020, report?

15       A.    No.

16       Q.    Your hesitation makes me

17   wonder whether there is something you're

18   thinking about.

19       A.    I was thinking about whether

20   a to-do list might qualify as a document

21   or material.

22       Q.    Did you create a to-do list?

23       A.    I created a to-do list for

24   things to review prior to today's

Christoph J. Flaherty, P.E.

1    deposition.

2          Q.    Okay.  Aside from the --

3    well, what was on the to-do list?

4          A.    Oh, review my -- review

5    reports, meaning my own report, Buckley's

6    report and your expert's reports, let's

7    see, go back to review a couple of the

8    photographs, and some documents regarding

9    the timeline of installation of thermal

10   protection.

11         Q.    Which photos did you remind

12   yourself to review?

13         A.    Some from Dr. Ferrese's

14   scene photographs and my own evidence

15   exam photographs.

16         Q.    Do these relate to some

17   particular subject?

18             MR. McGLYNN:  Objection.

19         You mean the subject within the

20         group of the photos or --

21             MR. VOTER:  Yeah.

22   BY MR. VOTER:

23         Q.    I assume when you said you

24   added reviewing photos to your to-do

Christoph J. Flaherty, P.E.

1    list, the way you expressed it made me

2    think that you were reviewing specific

3    photos or photos that dealt with some

4    specific subject matter.  Am I correct

5    about that?

6            A.    Not more specific than the,

7    you know, routing of electrical wiring,

8    the presence of circuits, and the

9    condition of the refrigerator at the time

10   of the scene inspection.

11           Q.    How many photographs would

12   you estimate were encompassed by the

13   subjects you just described?

14           A.    I would say, well --

15           MR. McGLYNN:  Objection.

16           THE WITNESS:  Hundreds of

17           photographs encompass the subject.

18           I probably went through one to two

19           hundred just refreshing my memory.

20   BY MR. VOTER:

21           Q.    Was that the only purpose in

22   doing it, to refresh your memory, or were

23   you looking for something specific?

24           MR. McGLYNN:  Objection.

Christoph J. Flaherty, P.E.

```
1              THE WITNESS:  The -- I was
2         doing it both to refresh my memory
3         and to look for any evidence of
4         the thermal protection.
5    BY MR. VOTER:
6         Q.    Did you find evidence of the
7    thermal protection in the photographs you
8    reviewed?
9         A.    I found evidence similar to
10   that presented in photographs in the
11   defense expert's reports.
12        Q.    Photographs of a thermal
13   protector, correct?
14        A.    The photographs that show
15   what is -- yes.
16        Q.    So the answer was yes?
17        A.    Yes.
18        Q.    Okay.  You mentioned
19   documents related to timeline of thermal
20   protection.  I think I got the gist of
21   that if not the exact way you expressed
22   it.  What documents did you review?
23        A.    I reviewed in my file that
24   you have the confidential LG production,
```

Christoph J. Flaherty, P.E.

1    and they're Bates stamped.  It looks like

2    30 pages Bates stamped between 648 and

3    678.

4                   MR. McGLYNN:  Can we just go

5            off the record for a second?

6                   MR. VOTER:  Sure.

7                   MR. McGLYNN:  Thanks.

8                   (Discussion held off the

9            record.)

10   BY MR. VOTER:

11           Q.    I said earlier, I forget if

12   we were on the record or not, but I have

13   received the file that Mr. McGlynn sent

14   me with 19 either folders or documents,

15   and each one is uniquely named.  Do you

16   have that same array of folders and

17   contents in your file?  Are you looking

18   at the same folders and document names?

19           A.    Yes.

20           Q.    Okay.  Which one of these

21   has the Bates stamped document 648 to 678

22   that you referred to?

23           A.    It's the document titled

24   "Light Overheating Issue."

Christoph J. Flaherty, P.E.

1          Q.    Got it, okay.  And can you
2  just take a look at it again just to
3  confirm that I'm looking at the same
4  thing you are?
5          A.    I have it.
6          Q.    Okay.  So what I'm looking
7  at, the first page which is document 648,
8  it says "Exhibit A-Affected Models" and
9  it's a confidential -- there is a
10  confidential stamp, correct?
11         A.    Yes.
12         Q.    Okay.  And then just to make
13  sure, the last page of that document --
14         A.    Joe is -- I'm sorry.  Joe
15  was waving, but I didn't hear him.  I
16  don't know if he was trying to make an
17  objection and couldn't.  I don't know
18  what.
19               MR. VOTER:  Were you, Joe?
20               Joe, can you hear us?  Can
21         you hear us?
22               (Recess; 10:35 a.m.)
23               (Resumed; 10:38 a.m.)
24               (The court reporter read

Christoph J. Flaherty, P.E.

1    back the preceding question and

2    answer.)

3 BY MR. VOTER:

4    Q.  And the last page is titled

5 "Changed Parts" and it's document Bates

6 0678, correct?

7    A.  Yes.

8    Q.  And do you know what that

9 document is?

10    A.  The -- the 31 pages

11 altogether?

12    Q.  Yes.

13    A.  Only by looking at it.  It

14 hasn't been reported to me as -- so, I

15 mean, I can tell you what I think it is

16 based on my review of it I guess.

17    Q.  Okay.  Go ahead.

18    A.  It looks like records of

19 internal testing and investigation

20 performed by LG regarding what we're

21 referring to as the light overheating

22 issue.

23    Q.  Based on your earlier

24 answers, I assume you've had this

Christoph J. Flaherty, P.E.

1      document or collection of documents,

2      these 31 pages, in your file before you

3      wrote your report; is that correct?

4              A.    Yes.

5              Q.    Did you review it before you

6      wrote your report?

7              A.    Yes.

8              MR. VOTER:  Let me just make

9              a comment for the record.  These

10             materials as I understand it were

11             generated by LG Korea.  My client

12             is LG Electronics USA, Inc.

13                  For ease of reference, I

14             will probably refer at times to LG

15             without necessarily specifying

16             which one I'm talking about, so if

17             we're talking about any work that

18             was done with regard to the light

19             bulb issue, I'm referring to LG

20             Korea in case I forget to add the

21             Korea to the end.

22     BY MR. VOTER:

23             Q.    Okay.  Let's go through the

24     rest of the file.  So I have Buckley's

Christoph J. Flaherty, P.E.

1    report, correct?

2         A.    Yes.

3         Q.    And then the next document,

4    I've got five documents or folders to a

5    line, and is that how you're looking at

6    them or you're looking at them in some

7    different way?

8         A.    No.  I'm looking at just a

9    single list, top to bottom.

10        Q.    Okay.  So I'm going to read

11   you the titles of each and then you tell

12   me if you've got it and then what it is.

13            So the first one is

14   19-033R3Allstate0537Ellis.PDF.  Actually

15   the word "insured" might be in there,

16   too.  Is that Buckley's report?

17        A.    Yes.

18        Q.    Okay.  The next one I have

19   says 1505 Report Final.  What's that?

20        A.    That is the Word document

21   version of my report which includes only

22   the text and no photographs.

23        Q.    Okay.  And then 1505 Report

24   Photographs, then it looks like Appendix

Christoph J. Flaherty, P.E.

1    A, Report Photographs, and it looks like

2    one is a Word doc and there is a second

3    one that's a PDF, correct?

4            A.    Correct.

5            Q.    Are they the same documents?

6            A.    Yes.

7            Q.    Or same photographs.  And

8    these are what's attached to the report

9    that was provided to me?

10           A.    Yes.

11           Q.    Okay.  And then we've got

12   "Additional Docs."  That's a folder, and

13   what is in there?

14           A.    These are some additional

15   documents that were provided to me it

16   looks like at the end of August.

17           Q.    And who provided them?

18           A.    Well, I got them from Mr.

19   McGlynn.

20           Q.    Okay.  Do you know what they

21   are?

22           A.    They're -- some of them are

23   records from a previous case involving

24   the -- an allegation of LG refrigerator

Christoph J. Flaherty, P.E.

1    light overheating issues.

2         Q.    Well, it looks like we're

3    going to need to go through these

4    individually then.

5              Okay.  In the folder called

6    "Additional Docs," there are 14

7    documents.  The first one says "Allstate

8    v. LG Confidential Document."

9              Do you see that?

10        A.    Yes.

11        Q.    What is that?

12        A.    The -- this is a copy of the

13   service flash that involved replacement

14   of the main control circuit board in the

15   LG manufactured refrigerator.

16        Q.    And next I have "Exhibit A

17   Selected Photographs."  What's that?

18        A.    I think these are selected

19   photographs from a different case,

20   previous fire involving an LG

21   refrigerator.

22        Q.    And these were received from

23   Mr. McGlynn?

24        A.    Yes.

Christoph J. Flaherty, P.E.

1        Q.      What case is it?

2        A.      I don't recall.  I think

3   it's the case that this other -- this

4   other material relates to.

5        Q.      Okay.  What other materials

6   in the Additional Docs folder relate to

7   this other matter?

8        A.      I think everything that's

9   listed as an exhibit, plus the -- not

10  that one.  Okay.  So everything, I think

11  everything in this file with the excep --

12  everything that's listed as an exhibit

13  plus the photographs, plus the document

14  that says "Rule 26 Report Final."

15       Q.      Is it your understanding

16  that all of the materials in your

17  Additional Docs folder, aside from the

18  service flash that you identified, relate

19  to case name of Magee?

20       A.      Well, not all of the

21  materials.  I think there was -- there

22  are a couple of other exceptions there.

23  So all of the materials except for the

24  service flash which was the Allstate

Christoph J. Flaherty, P.E.

1    versus LG - Confidential Document, the

2    document titled "LGEUSellis0500 to 0647,"

3    and the document titled "Protective."  So

4    those three items do not relate to Magee.

5           Q.    Okay.  Let's go through

6    these.  So the first one we've already

7    talked about, that was the service flash,

8    right?

9           A.    Yes.

10          Q.    The second one, Exhibit A,

11   Selected Photographs, to your

12   understanding are these from Magee?

13          A.    That is my understanding,

14   yes.

15          Q.    Do you know what they are

16   photographs of?

17          A.    Not other than just what

18   they visually depict.

19          Q.    Okay.  The top photograph

20   says Photograph No. 131, "Arc exam on

21   conductor found in refrigerator," agreed?

22          A.    Yes.

23          Q.    Do you know where in the

24   refrigerator it was found?

Christoph J. Flaherty, P.E.

1       A.      No.

2       Q.      The next photo, the

3   photograph below is Photo 6, "Severe fire

4   damage to refrigerator."  Did you ever

5   actually see the refrigerator?

6       A.      Not the one depicted in this

7   photograph.

8       Q.      Did you see any photographs

9   from that refrigerator besides from these

10  three?

11      A.      No.

12      Q.      Did this Exhibit A inform

13  your opinion in this case?

14      A.      Not specifically.  The

15  whole -- I mean, everything in this file

16  informed my opinion to the -- in this

17  file, I mean, in this current directory

18  we're looking at, in the Magee file,

19  informed my opinion to the extent that

20  there had previously also been documented

21  issues with the internal illumination

22  light overheating.  There is no specific

23  photograph here that figured into my

24  investigation other than that general

Christoph J. Flaherty, P.E.

1    point.

2         Q.    Other than evidence that on

3    some previous occasion someone claimed a

4    light bulb stayed on and caused a fire in

5    an LG refrigerator, did any of the

6    materials from Magee inform your opinions

7    in this case in any way?

8              MR. McGLYNN:  Objection.  I

9         mean --

10             MR. VOTER:  Okay.  You made

11        an objection, Joe.

12             MR. McGLYNN:  Okay.

13             THE WITNESS:  Not outside of

14        the general point.

15   BY MR. VOTER:

16        Q.    Just that on some other

17   occasion somebody made a claim that a

18   light bulb stayed on and started a fire

19   in an LG refrigerator?  That's it, right?

20             MR. McGLYNN:  Objection.

21   BY MR. VOTER:

22        Q.    You can answer.

23        A.    That that should in my mind

24   be considered as a potential ignition

Christoph J. Flaherty, P.E.

1     source.

2             Q.      Okay.   Anything beyond that?

3             A.      No.

4             Q.      Did you ever examine the

5     refrigerator from the Magee case?

6             A.      No.

7             Q.      Do you know whether it

8     contained the same components and design

9     as the Ellis refrigerator?

10            A.      No.

11            Q.      So just to finish the

12    description, we've got Exhibit B.   That's

13    Charles Fricke's CV, correct?

14            A.      Yes.

15            Q.      Do you know who Charles

16    Fricke is?

17            A.      Yes.   I think he pronounces

18    it Fricke.

19            Q.      Okay.   Have you met him?

20            A.      Yes, but not in connection

21    with this matter.

22            Q.      Have you had any discussions

23    with him pertaining to your involvement

24    in this case?

Christoph J. Flaherty, P.E.

1      A.     I did have a discussion with

2   him, yes.

3      Q.     When was that?

4      A.     I don't recall.  I think it

5   was this last summer.

6      Q.     Before you wrote your

7   report?

8      A.     Yes.

9      Q.     What did you learn from him

10  in that conversation?

11     A.     Nothing more than what was

12  indicated in his file, his involvement in

13  that case in which it was his opinion

14  that an overheated -- or a light bulb

15  that could stay illuminated because of

16  some failures in circuitry within the LG

17  refrigerator could overheat and cause a

18  fire.

19     Q.     Did you make notes of that

20  conversation?

21     A.     No.

22     Q.     Did anything you learned in

23  that conversation inform your opinion in

24  this case?

Christoph J. Flaherty, P.E.

1          A.    Just to the extent that the
2    light bulb should be considered as a
3    potential ignition source.
4          Q.    Did you reference that
5    conversation in your report?
6          A.    No.  I believe the light
7    bulb, I mean, to my recollection I was
8    considering the light bulb as a potential
9    ignition source prior to that
10   conversation, so it wasn't that this
11   conversation provided the late impetus to
12   consider that.
13         Q.    I don't know if I asked you
14   this, but did you make notes of that
15   conversation?
16         A.    No.
17         Q.    Is it your typical practice
18   not to make notes of a conversation you
19   have with an engineer with respect to
20   some case you're involved in?
21              MR. McGLYNN:  Objection.
22              THE WITNESS:  Yes.  I
23         typically do not take notes.
24   BY MR. VOTER:

Christoph J. Flaherty, P.E.

1        Q.      How long was your

2   conversation?

3        A.      I don't remember.

4        Q.      Can you give me an estimate?

5        A.      I would estimate 20 to 30

6   minutes.

7        Q.      What else did you discuss

8   during that 20 to 30 minutes?

9        A.      That's it.

10       Q.      Well, okay.  Let me ask the

11  question in a better way.  What did you

12  discuss in 20 to 30 minutes with Mr.

13  Fricke?

14       A.      The -- what led, why he

15  considered it being the overheating of

16  the light bulb, and we discussed the

17  sticking relay and the physical repair or

18  the product or equipment replacement that

19  LG undertook to address the sticking

20  relay.

21       Q.      Did he know about the

22  efforts undertaken by LG Korea to address

23  what you referred to as the sticking

24  relay issue?

Christoph J. Flaherty, P.E.

1          A.    He did know and showed me

2     like some -- he did know about the

3     circuit board replacement and the relay

4     replacement and showed me some pictures

5     that indicated the difference between the

6     original installation versus the

7     replacement installation.

8          Q.    Are those photos in your

9     file?

10         A.    Yeah.  I think they're in

11    that, they're the three photographs in

12    that one directory that we were just

13    discussing.

14         Q.    So am I correct that those

15    are photos P1310012, 014 and 015?

16         A.    Yes.

17         Q.    And these came from Mr.

18    Fricke?

19         A.    That's my understanding.

20    I'm not sure if he took them himself or

21    who took them, but yes.

22         Q.    So tell me what you

23    understand 012 to be or to show?

24         A.    012 shows two samples of the

Christoph J. Flaherty, P.E.

1    main control circuit board of the LG

2    manufactured refrigerator, one which was

3    represented to me as the original

4    construction, and the second being the

5    one on the right as the replacement or

6    updated construction.

7              Q.    And when you say original,

8    was it the original for the model

9    involved in this case?

10             A.    Yes.

11             Q.    Is that the same model as

12   involved in the Ellis case?

13             A.    I don't recall specifically.

14             Q.    Did you make any effort to

15   find out?

16             A.    The control boards and

17   everything that I saw were sufficiently

18   similar to consider them to be

19   effectively the same, but I don't think I

20   dug down more deeply than that.

21             Q.    So was the answer to my

22   question you did not attempt to determine

23   if it was the same model as involved in

24   Ellis?

Christoph J. Flaherty, P.E.

1          MR. McGLYNN:  The model of
2     circuit board or the model of
3     refrigerator?
4          MR. VOTER:  Model of
5     refrigerator.
6          THE WITNESS:  That is
7     correct.
8     BY MR. VOTER:
9          Q.    Did the refrigerator
10    involved in the Magee case have one or
11    the other of the two circuit boards shown
12    in Photo 012?
13         A.    I don't know.
14         Q.    What does Photo 014 show?
15         A.    014 looks like a close-up of
16    the left -- the relays located in the
17    bottom right-hand corner of the left
18    circuit board from 012.
19         Q.    And the 015 photo is a
20    close-up of the other circuit board from
21    012, correct?
22         A.    Yes.
23         Q.    When we talk about relay,
24    can we agree that we're referring to a

Christoph J. Flaherty, P.E.

1   relay that is in the circuit for the
2   light bulb?
3          A.    Yes.
4          Q.    Okay.   There were more than
5   one relay in the refrigerator, right?
6          A.    Yes.
7          Q.    Okay.   But the one that
8   we're concerned with is the one that is
9   in the circuit for the light bulb that's
10  in the upper section of the refrigerator,
11  correct?
12         A.    That's right.
13         Q.    Okay.   And am I correct that
14  you don't know what relay was in the
15  Magee refrigerator?
16         A.    That's right.
17         Q.    And you don't know what
18  circuit board was in the Magee
19  refrigerator?
20         A.    That's right.
21         Q.    Do you know why he sent you
22  those photos?
23         A.    He was showing me the
24  difference between the two phases of the

Christoph J. Flaherty, P.E.

1  circuit board design with LG's addressing

2  of the light overheating issue.

3      Q.    Did you ask him whether

4  there was a report from the defense in

5  that case?

6      A.    No.

7      Q.    Did you expect if he

8  prepared a report that there would have

9  been a defense report?

10     A.    Yes.

11     Q.    Is there a reason you didn't

12  ask for that?

13     A.    The -- the -- again, because

14  the case only prompted me to or affirmed

15  that the consideration that I should

16  continue to consider the light

17  overheating as a potential ignition

18  source in the Ellis case in particular.

19  I wasn't interested in trying to do an

20  independent analysis of the Magee case.

21     Q.    Did you discuss with him

22  what the defense response opinions from

23  the McGee case were?

24     A.    I don't recall.

Christoph J. Flaherty, P.E.

1          Q.     Did you have his Magee

2     report before you spoke to him?

3          A.     I don't think so.

4          Q.     Who did you receive his

5     report from?

6          A.     That was included with all

7     of the other documents in that Additional

8     Docs folder from Mr. McGlynn.

9          Q.     And it was received after

10    your conversation with Mr. Fricke?

11         A.     Yes.  I think those

12    documents were either received at that

13    time or after.

14         Q.     Okay.  Well, let me be clear

15    in my question.  At the time you spoke

16    with Mr. Fricke, did you have any of the

17    Magee materials?

18         A.     I know that I had not

19    reviewed any of the Magee materials prior

20    to speaking with Mr. Fricke.

21         Q.     Whose idea was it for you to

22    speak to Fricke?

23              MR. McGLYNN:  Objection.

24    BY MR. VOTER:

Christoph J. Flaherty, P.E.

1          Q.     You can answer.

2          A.     Mr. McGlynn's.

3          Q.     Were you curious what the

4    defense expert or experts said in

5    response to Mr. Fricke's opinions?

6               MR. McGLYNN:  Objection.

7               THE WITNESS:  No.  Again, I

8          considered this as more general

9          information and I wasn't really

10         interested in redoing the Magee

11         investigation.

12   BY MR. VOTER:

13         Q.     Did you ask him how that

14   case turned out?

15         A.     No.

16         Q.     After you reviewed the

17   materials, did you reach out to Mr.

18   Fricke again?

19         A.     No.

20         Q.     Is it your understanding

21   that the circuit board on the right in

22   Photo 012 shows evidence of a change to

23   the circuit board that's related to the

24   light bulb issue?

Christoph J. Flaherty, P.E.

1        A.     Yes, that's --

2             MR. McGLYNN:  Objection.

3             THE WITNESS:  Yes, that's my

4        understanding.

5    BY MR. VOTER:

6        Q.     As it relates to the circuit

7    board, what is your understanding of the

8    change that was made?

9        A.     The relay controlling the

10   interior illumination light was replaced

11   with a larger one.

12       Q.     So can you -- do you know

13   from looking at 012, Photo 012, which

14   relay was changed to address the light

15   bulb issue?

16       A.     It looks like it was the

17   middle.  If we're looking at the left

18   circuit board, it would have been the

19   middle of the five black smaller relays.

20             MR. VOTER:  I may make a

21             little bit of noise.  I'm going to

22             try to print that.  I'm going to

23             mark this as Flaherty-4, and I'll

24             just hold it up so you can look at

Christoph J. Flaherty, P.E.

1          it.

2                    (Exhibit Flaherty-4 was

3          marked for identification.)

4    BY MR. VOTER:

5          Q.    Can we agree that what I'm

6    going to mark as Flaherty-4 is the Photo

7    P1310012 that's in your file?

8          A.    Yes.

9          Q.    Okay.  Is the relay that we

10   are discussing that was changed contained

11   or included within the array of relays at

12   the bottom right of each board?

13         A.    Yes.

14         Q.    Okay.  And if I start with

15   the relay all the way -- how many relays

16   are in that array on each board?

17         A.    I would say there are six in

18   that particular row in both cases,

19   starting with a visibly larger one on the

20   leftmost side which is approximately the

21   center of the board.

22         Q.    So if we start with the

23   leftmost relay and work our way to the

24   right, can you tell me what position the

Christoph J. Flaherty, P.E.

1    changed relay occupies on the new board

2    or on the right-hand board?

3         A.    We call the leftmost one

4    number one, and it would be two, three

5    four.  It would be position four.

6         Q.    Okay.  Can we agree that the

7    position four relay on the left board is

8    black in color and smaller than the

9    position four relay on the right board

10   which is larger and blue in color?

11        A.    Yes.

12        Q.    All right.  What's the

13   difference between the position four

14   relay on the left board versus the

15   position four relay on the right board?

16        A.    It's larger, both in the

17   physical and electrical sense.

18        Q.    Well, that's what I'd like

19   you to explain.  Explain in the

20   electrical sense what the difference

21   between the two is.

22        A.    The larger relay can

23   interrupt and switch higher amounts of

24   current or is described to be able to

Christoph J. Flaherty, P.E.

```
1    interrupt and switch higher amounts of
2    current, electrical current.
3            Q.      Do you have an understanding
4    based on your review of materials in this
5    case what the rationale was for going to
6    a larger relay in the light bulb circuit?
7            A.      Yes.
8            Q.      What was the reason?
9            A.      The LG investigation
10   determined that the smaller relay could
11   stick shut.  So they exchanged it with a
12   larger one which would be less likely to
13   stick shut.
14           Q.      When you say "stick," that
15   just means it wouldn't turn to an off
16   position or off state when it was
17   expected to, correct?
18           A.      Correct.
19           Q.      And that would result in the
20   light bulb staying on even though the
21   door was closed, correct?
22           A.      Correct.
23           Q.      Do you understand
24   electrically why the larger relay would
```

Christoph J. Flaherty, P.E.

```
 1      not have that problem?
 2              A.    Well, it would be less
 3      likely to have that problem.  And the
 4      reason for that would be in the design of
 5      the relay, the contact surfaces are
 6      likely larger which would dissipate the
 7      electrical energy over a larger surface
 8      area so as not to cause as much damage,
 9      and the internal mechanism separating the
10      relay contacts is likely also larger by
11      which I mean it would exert more force to
12      separate the contacts when the relay
13      should be off.
14              Q.    When you say less likely,
15      are you aware of any large relay on an LG
16      refrigerator that stuck and resulted in
17      the light bulb staying on when the
18      refrigerator doors were closed?
19              A.    No.
20              Q.    Did you do any testing of
21      the larger relay to determine how often
22      it would stick and result in a light bulb
23      staying on even though the doors of the
24      LG refrigerator were closed?
```

1          A.     No.

2          Q.     Is that something that you

3     could have done as an electrical

4     engineer?

5          A.     Not in any meaningful way to

6     represent the facts in this particular

7     case.

8          Q.     Okay.  Well, my question

9     dealt more with your experience and

10    training.  Did you possess the experience

11    and training to do such a test?

12              MR. McGLYNN:  Objection;

13         asked and answered.

14    BY MR. VOTER:

15         Q.     You can answer the question.

16         A.     Yes.

17         Q.     You do?

18         A.     Yes.

19         Q.     Did you consider running

20    such a test?

21         A.     No.  Well, I did consider

22    it.  I determined not to I guess is a

23    better answer.

24         Q.     When did you consider that?

Christoph J. Flaherty, P.E.

1          A.    When I had determined that
2   the Ellis refrigerator had the larger
3   relay.
4          Q.    And was that before or after
5   you wrote your report?
6          A.    Before.
7          Q.    So can we agree that at the
8   time of the fire the Ellis refrigerator
9   had the larger relay --
10         A.    Yes.
11         Q.    -- for the light bulb
12  circuit, correct?
13         A.    Yes.
14         Q.    And so we're clear, that's
15  -- the larger relay was the replacement
16  for the smaller relay that was identified
17  as causing or allowing light bulbs to
18  stay on even though the doors were
19  closed, correct?
20         A.    It was --
21         MR. McGLYNN:  Objection.
22  Sorry, you can answer.
23         THE WITNESS:  It was
24         identified by the LG investigation

Christoph J. Flaherty, P.E.

```
 1              as possibly sticking, causing the
 2              light to remain on.
 3    BY MR. VOTER:
 4         Q.    And you saw the -- you read
 5    the results of that root cause analysis
 6    that's contained in the documents that
 7    are marked 0648 to 0670, correct?
 8         A.    Yes.
 9         Q.    Did you have any reason to
10    disagree with their conclusion that in
11    some cases the small relay would stick
12    and allow the light bulb to stay on?
13              MR. McGLYNN:  Objection.
14              THE WITNESS:  No.
15    BY MR. VOTER:
16         Q.    And I think you said you're
17    not aware of a single instance where the
18    large relay stuck resulting in the light
19    bulb staying on even though the doors
20    were closed, correct?
21         A.    Correct.
22         Q.    What kind of testing did you
23    consider?
24         A.    We considered doing the, you
```

Christoph J. Flaherty, P.E.

1    know, relay cycling testing or I
2    considered that.  I considered testing of
3    the thermal characteristics of wattages
4    of lamps installed in refrigerators in
5    terms of temperatures that they might
6    reach if they were left on.
7            Q.    Anything else?
8            A.    No.
9            Q.    You majored in physics at
10   the Naval Academy, correct?
11           A.    Correct.
12           Q.    What is the mechanism that
13   results in a relay not opening when it's
14   supposed to?  You talked about contacts.
15   Do the contacts stick together?
16               MR. McGLYNN:  Objection.
17               THE WITNESS:  Yes.
18           Typically the most common reason
19           for a relay failing to open is
20           that the contact surfaces become
21           damaged through the progressive
22           cycles and metals making up those
23           contact surfaces soften and melt
24           and eventually effectively weld

Christoph J. Flaherty, P.E.

1           themselves together.

2    BY MR. VOTER:

3           Q.    You just said there is a

4    minute arc that goes on as they close and

5    as they separate, right?

6           A.    Yes.

7           Q.    And over time that can

8    affect the surfaces and affect the

9    conductivity between them, and then over

10   additional time in some cases that can

11   result in a welding together, correct?

12                MR. McGLYNN:  Objection.

13                THE WITNESS:  Yes.

14   BY MR. VOTER:

15          Q.    And that's why even though

16   the circuit is telling the relay it's

17   time to open up because the door is

18   closed, the relay doesn't because the

19   contacts are welded together, right?

20          A.    Yes.

21          Q.    Did you make any effort to

22   determine if the relay on the Ellis

23   circuit board for the light bulb had

24   contacts that were open or closed?

Christoph J. Flaherty, P.E.

1        A.      No.

2        Q.      Is that something as an

3   electrical engineer you could have done?

4        A.      Yes.

5        Q.      Meaning you know how to do

6   that?

7        A.      Yes.

8        Q.      Did you choose not to?

9        A.      The -- I did not consider it

10  at the time of the inspection.

11       Q.      Did you at any time after

12  the inspection?

13       A.      I did consider it at the

14  time after the inspection, yes.

15       Q.      When?

16       A.      When I began to consider the

17  light being on as a potential ignition

18  source.

19       Q.      When did you start

20  considering that as a potential ignition

21  source?

22       A.      That would have been in the

23  month or so after the evidence

24  examination.

Christoph J. Flaherty, P.E.

```
1          Q.    Was it around the time that
2     you received the materials on the Magee
3     case from Mr. McGlynn?
4          A.    The -- no.  I think it was
5     before that.
6          Q.    So did you come up with that
7     on your own or was there some other
8     source --
9               MR. McGLYNN:  Objection.
10          Come on.
11               MR. VOTER:  Basis?
12               MR. McGLYNN:  Objection.
13          First of all, if you're asking for
14          what I talked to him about are
15          attorney-client privilege, I think
16          you know better than that, Warren,
17          and second, the form is
18          objectionable.
19               MR. VOTER:  Okay.  I'll
20          rephrase the question and I'll
21          make it clear.
22     BY MR. VOTER:
23          Q.    I don't want to know
24     anything about communications you've had
```

Christoph J. Flaherty, P.E.

1       with Mr. McGlynn.  Okay?

2                A.    Got it.

3                      MR. McGLYNN:  It sounded

4                like when you say did you come up

5                with that on your own and you're

6                talking about a conversation with

7                Mr. McGlynn, that's exactly what

8                you were asking.

9                      MR. VOTER:  I didn't mention

10               anything about a conversation with

11               you.

12                     MR. McGLYNN:  Okay.  Okay.

13               When Mr. McGlynn was sending the

14               documents, but the witness has

15               been advised that you don't get

16               into anything that we discussed.

17                     Okay, C.J.?

18                     THE WITNESS:  Got it.

19                     MR. VOTER:  Agreed.  We're

20               clear on that.

21       BY MR. VOTER:

22                Q.    So let me ask the question

23       again.  I'll make it simpler.

24                     Did you come up with the

Christoph J. Flaherty, P.E.

1   idea as the light bulb as a potential

2   source of ignition on your own?

3         A.    Yes, or it was the light

4   bulb or a connection, you know, resistive

5   connection issue.  In terms of the relay

6   sticking, I had no knowledge that that

7   had been an issue, an identified issue in

8   certain LG refrigerators at the time that

9   I was beginning to consider the light

10   bulb as a potential ignition source, or

11   the light bulb circuit I should say,

12   because I was really just considering

13   just the light bulb.  It was just that.

14         Q.    I'll get into it in some

15   more detail later, but is it fair to say

16   that you've offered two alternative

17   opinions in this case about the cause of

18   the fire?  One is the light bulb

19   overheating, and I'm just trying to give

20   a shorthand summary of it, I'm not trying

21   to give you all of the details.  One is

22   the light bulb overheating and the other

23   is an arc on the wiring harness, fair?

24         MR. McGLYNN:  Objection.

Christoph J. Flaherty, P.E.

1          THE WITNESS:  Yes.

2    BY MR. VOTER:

3          Q.    Okay.  So we're only talking

4    about the light bulb overheating issue at

5    this point.  So at some point -- well, we

6    know that when you wrote your report in

7    November of 2020, light bulb overheating

8    causing fire was one of your opinions.

9          My question is, when did you

10   make the determination that that was

11   going to be one of your two opinions?

12          MR. McGLYNN:  Objection.

13          THE WITNESS:  I'm not sure

14       there was a specific time.  It

15       came out of a month's long process

16       of review and consideration of

17       various items.

18   BY MR. VOTER:

19          Q.    Was it before or after you

20   reviewed the Magee materials?

21          A.    I began considering a light

22   bulb or I should say the light bulb

23   circuit as a potential ignition source

24   before reviewing the Magee materials.

Christoph J. Flaherty, P.E.

1   Reviewing the Magee materials called more

2   specific attention to relays and their

3   performance and did lend some credence to

4   that as a general theory.

5       Q.   So when did you reach your

6   conclusion about the light bulb?  Was it

7   before or after reviewing the Magee

8   materials?

9       A.   The conclusion would have

10  been reached during the preparation of my

11  report, so...

12      Q.   And when was that?  It's got

13  a November 6 date on it.  When?

14      A.   Late October, early

15  November.

16      Q.   Okay.  When did you consider

17  testing or otherwise examining the relay

18  in the Ellis refrigerator to see if it

19  was stuck?

20      A.   The -- in the summer, so

21  let's see, that would have been after the

22  Magee.  Yeah, so July or August, in the

23  summer.

24      Q.   How would you have tested

Christoph J. Flaherty, P.E.

```
1     it?
2             A.     It would have been a --
3             MR. McGLYNN:   Objection.
4             THE WITNESS:   --
5     conductivity check across the
6     relay terminals.
7     BY MR. VOTER:
8             Q.     How long does that take?
9             A.     Not very long?
10            Q.     Minutes?
11            A.     Yes.
12            Q.     And you decided not to do
13    that, correct?
14            A.     Correct.
15            Q.     Why?
16            A.     Because I didn't think -- at
17    that point I knew the larger relay had
18    been installed and the -- I considered it
19    unlikely that the relay itself had stuck
20    or was still stuck.
21            Q.     Is it still your opinion
22    today that the light bulb could have been
23    a cause of this fire?
24            A.     Yes, although based -- yes.
```

Christoph J. Flaherty, P.E.

1        Q.    Let me back up.  Are you

2   saying that you didn't need to -- you

3   didn't feel that there was any benefit in

4   testing the relay in the Ellis

5   refrigerator?

6                MR. McGLYNN:  Objection.

7                MR. VOTER:  Basis?

8                MR. McGLYNN:

9        Mischaracterization.

10  BY MR. VOTER:

11       Q.    I'm not sure I understand

12  your answer why you chose not to do the

13  testing of the relay.

14       A.    Because there were other

15  ways that the light bulb could have been

16  on and I did not think -- I considered it

17  at that point unlikely that the relay was

18  stuck based on the work that LG had done.

19       Q.    Go back to the other

20  testing.  You said that you considered

21  relay cycling testing.  Would you

22  describe what that would accomplish?

23       A.    Well, it would determine how

24  a -- well, for it to be meaningful, it

Christoph J. Flaherty, P.E.

1    would have to be done on many examples of

2    a particular relay.  And if you had

3    enough data, it would determine how many

4    cycles and under what current levels the

5    relay would typically be expected to

6    last.

7           Q.    Is that something you're

8    capable of doing?

9           A.    Capable, yes.  It would be a

10   very time consuming effort.

11          Q.    You also talked about

12   testing that you considered to determine

13   the thermal characteristics of the lamp,

14   and as an example you gave the

15   temperatures it would reach if left on.

16                Do you recall that?

17          A.    Yes.

18          Q.    And what would the point of

19   that be?

20          A.    Well, if we had any

21   expectation to accurately reproduce the

22   conditions in the Ellis's refrigerator,

23   the point would be to see how -- what

24   might be able to be ignited and how it

Christoph J. Flaherty, P.E.

1    might be able to be ignited by the light

2    bulb.

3         Q.    Why would that be important?

4         A.    Well, the challenge there is

5    that there are too many variables to

6    consider to try and get any kind of a --

7    anything that could be considered an

8    accurate or reproducible or relevant

9    result.

10        Q.    So am I correct that you

11   considered doing testing that would have

12   told you whether the light bulb got hot

13   enough to ignite something, but chose not

14   to because there were too many variables;

15   is that correct?

16             MR. McGLYNN:  Objection.

17   BY MR. VOTER:

18        Q.    You can answer.

19        A.    Correct.  I couldn't -- I

20   did not feel that we could accurately

21   reproduce the conditions that might have

22   existed in the Ellis's refrigerator to

23   the degree of specificity necessary to

24   make that determination.

Christoph J. Flaherty, P.E.

1        Q.     What were the variables that

2   made that difficult?

3        A.     It would have been the age

4   of the refrigerator, the number of

5   heating cycles it had previously been

6   exposed to through the light being on and

7   off and maybe staying on under certain

8   circumstances.  It would be the presence

9   or not of a light guard or lens over the

10  fixture.  It would be the proximity of

11  food storage items or anything else that

12  would have been stored inside the

13  refrigerator, the nature and the

14  proximity of those things.

15       Q.     Anything else?

16       A.     I think that's about it.

17       Q.     How does the location,

18  presence or location of food storage

19  items affect the temperature that the

20  light bulb could reach?

21       A.     It would affect the

22  ventilation that the light bulb would be

23  subject to and it would also affect how

24  much -- depending on what kind of items

Christoph J. Flaherty, P.E.

1  they were and how close they were to the

2  light bulb, they may provide a kind of

3  thermal insulation.  It would also

4  provide the first material ignited

5  depending on what it was.

6      Q.   Do you know what was in the

7  refrigerator just before the fire?

8      A.   Not specifically.

9      Q.   Do you know any item that

10  was in the refrigerator at the time just

11  before the fire?

12      A.   No, not specifically.

13      Q.   I don't know what "not

14  specifically" means.  My question is very

15  simple.  Do you know any item that was in

16  the refrigerator just before the fire?

17      A.   There was food in there.

18      Q.   What was the food?

19      A.   I don't know.

20      Q.   What was it in?

21      A.   I don't know.

22      Q.   Was it in anything?

23      MR. McGLYNN:  I'm sorry.  I

24  couldn't hear the question.

Christoph J. Flaherty, P.E.

```
1    BY MR. VOTER:
2           Q.     Was it in anything?
3           A.     Most likely.
4           Q.     No.  My question is, was it
5    in anything, sir?
6                  MR. McGLYNN:  Was the food
7           in anything like a container?
8                  MR. VOTER:  Exactly.  Let me
9           ask the question again.
10   BY MR. VOTER:
11          Q.     What's the basis for you to
12   believe that there was food in the
13   refrigerator?
14          A.     That it's a -- it's the
15   refrigerator in the kitchen of the
16   Ellis's, that during the evidence exam
17   there is a physical odor of spoiled food
18   items and insect infestation that is
19   commensurate with spoilage of food items.
20          Q.     Would these food items have
21   been in the freezer portion of the
22   refrigerator?
23          A.     They were in both.
24          Q.     Okay.  So you actually saw
```

Christoph J. Flaherty, P.E.

```
1    food items in the refrigerator portion of
2    this product?
3            A.    I saw remains of food
4    containers, yes.
5            Q.    Is that the same as seeing
6    food?
7            A.    Well, they were pretty
8    badly --
9                  MR. McGLYNN:  Objection.
10                 THE WITNESS:  -- burned, so
11           I'm not sure if I recognized any
12           particular carbonized mass as food
13           versus container.
14   BY MR. VOTER:
15           Q.    Do you know how many
16   containers if any were in the
17   refrigerator just before the fire?
18           A.    No.
19           Q.    Assuming there were any in
20   there, do you know where they were
21   located within the refrigerator?
22           A.    No.
23           Q.    Sorry?
24           A.    No.
```

Christoph J. Flaherty, P.E.

1        Q.     Assuming that there were any

2   in there, do you know what any of those

3   containers were made of?

4        A.     No.

5        Q.     Is it fair to say that one

6   of the reasons that you decided not to do

7   the thermal characteristics testing was

8   that you had no idea what if anything was

9   around the light bulb in the Ellis

10  refrigerator?

11              MR. McGLYNN:   Objection.

12              THE WITNESS:   That's right.

13  BY MR. VOTER:

14       Q.     I'm sorry?

15       A.     I said that's right.

16              I'm going to need to take a

17  bathroom break and a water refill break

18  pretty soon.

19       Q.     Give me a few more minutes.

20  I think we'll be at a good place to stop.

21              You said that there were, I

22  think you said that there were other ways

23  that a light could stay on.  I'm

24  paraphrasing, but is that what you said?

Christoph J. Flaherty, P.E.

1          A.      Yes.

2          Q.      And what other ways could

3     the Ellis refrigerator light stay on?

4          A.      If there was a failure in

5     the relay control circuit or in the door

6     switch that caused it to be energized

7     when it shouldn't have been, meaning the

8     relay is receiving a control signal to

9     stay shut even though it should be off.

10              MR. VOTER:  Can I hear the

11          answer back, please?

12              (The court reporter read

13          back the preceding answer.)

14     BY MR. VOTER:

15          Q.      So am I correct that you're

16     not saying that either of those things

17     happened?  You're just identifying those

18     as possibilities, correct?

19          A.      Correct.

20          Q.      Was there any evidence that

21     you became aware of that the Ellises

22     believed, suspected, knew, any of those,

23     that their light was staying on even

24     though the refrigerator doors were

Christoph J. Flaherty, P.E.

1    closed?

2         A.    No.

3         Q.    Did you conduct any tests to

4    determine whether either of those two

5    other ways that the light could have

6    stayed on actually happened in this case?

7         A.    No.

8         Q.    Did you do any research that

9    would have provided information to you

10   about whether a refrigerator with the

11   same design as the Ellis model has ever

12   had a problem like those two

13   possibilities that you identified?

14              MR. McGLYNN:  Objection.

15              MR. VOTER:  You can answer.

16              THE WITNESS:  I did not find

17         instances of light staying on

18         separate from the identified

19         smaller relay sticking issue.

20   BY MR. VOTER:

21        Q.    The relay that the Ellis

22   refrigerator did not, correct?

23        A.    Correct.

24              MR. VOTER:  Why don't we

Christoph J. Flaherty, P.E.

```
1              take that break.
2                   THE WITNESS:  Okay.
3                   (Recess; 11:48 a.m.)
4                   (Resumed; 12:01 p.m.)
5    BY MR. VOTER:
6         Q.   Mr. Flaherty, let me go back
7    to your file materials, so if we can
8    knock those out.
9                   Did you say that Exhibits A,
10   B, C, D, E, F and G all relate to the
11   Magee case?
12        A.   Yes, I think I did say that.
13                  MR. McGLYNN:  Well, just
14             hold on a second.  I mean, just
15             take the time and make sure.  I'm
16             sorry for interrupting, but just
17             don't assume that we heard what
18             you said accurately.  Okay?
19   BY MR. VOTER:
20        Q.   Well, let's go through them
21   quickly.  We've already talked about
22   Exhibit A.  That was three photographs.
23   Exhibit B is Fricke's CV, correct?
24        A.   Yes.
```

Christoph J. Flaherty, P.E.

1          Q.     Exhibit C is Fricke's list
2     of testimony.  Exhibit D is the Fee
3     Schedule.  Exhibit E is Data and
4     Information Considered.  This appears to
5     be from his report, correct?
6          A.     Yes.
7          Q.     And it's just a list.  It's
8     not the actual data and/or information,
9     correct?
10          A.     Right, correct.
11          Q.     Exhibit F is something
12     called Sample Complaints.  It looks like
13     it's -- I can't tell how many pages long.
14     Oh, Page 1 of 5, so it looks like it's
15     five pages long?
16          A.     Yes.
17          Q.     Is this from Magee also?
18          A.     Yes.
19          Q.     Did this document, Exhibit
20     F, play any role in your conclusions in
21     this case?
22          A.     Not other than the continued
23     consideration of the light bulb as a
24     potential ignition source.

Christoph J. Flaherty, P.E.

1      Q.    Well, let me be clear.  Was

2  there anything that you considered

3  evidentiary about Exhibit F and used in

4  your analysis and conclusions in this

5  case?

6      A.    Just provided background

7  information regarding the potential for

8  overheating due to the light bulb.

9      Q.    Because of the relay issue,

10  right?

11      A.    Well, it could be due to any

12  issue which would cause the light bulb to

13  stay on.  The only identified one here is

14  the relay issue.

15      Q.    Okay.  And it would be a

16  fair statement that -- I haven't read

17  these in any detail, but would it be a

18  fair statement to say that you don't know

19  anything about the design and components

20  of the refrigerators that are subject of

21  the customer complaints reflected in

22  Exhibit F?

23          MR. McGLYNN:  Objection.

24          THE WITNESS:  That is

```
 1            correct.
 2      BY MR. VOTER:
 3            Q.    Okay.  Exhibit G, Printed
 4      Circuit Board Revisions, did this
 5      document play any role in the opinions
 6      you're intending to offer in this case?
 7            A.    No.
 8            Q.    Okay.  Then there is a
 9      document that just says LGEUS, and I'm
10      not sure what that character is, but
11      Ellis 0500 to 0647, correct?
12            A.    Correct.
13            Q.    Can you tell me what the
14      first 0500 through 0633 is?
15            A.    Well, the first page
16      identifies this as a report on household
17      refrigerator, LG Electronics, from 2004
18      by Underwriters Laboratories.
19            Q.    Can you go to Document 0637?
20            A.    Okay.
21            Q.    It's a multipage document.
22                  Did you review it?
23            A.    I don't recall this
24      document.
```

Christoph J. Flaherty, P.E.

1          Q.     You say you don't recall.

2     Does that mean you did not review it?

3          A.     I don't remember.

4          Q.     Do you have any recollection

5     of what that document pertains to?  Just

6     if I can ask you right now, just if you

7     would, don't look at the -- don't scroll

8     through the document.  I'll represent

9     that the first page of it indicates that

10    it's a letter from the Winston & Strawn

11    law firm dated November 26, 2008.

12               Do you have any recollection

13    of what is in that letter?

14          A.     No.

15          Q.     Do you have any explanation

16    for why if it's in your file?  You have

17    no recollection?

18          A.     No.

19          Q.     Do you normally review

20    materials that are provided to you?

21          A.     Yes.  I think my only

22    explanation in this case would be that

23    it's at the end and attached to this UL

24    report, and I likely made the assumption

1   that that entire file was the UL report

2   and didn't review every page of the UL

3   report.

4        Q.    Do you see the several

5   pages, I think it's three, before the

6   Winston & Strawn letter?

7        A.    I -- yes.

8        Q.    Are those wire diagrams or

9   circuit diagrams?

10       A.    Yes.

11       Q.    Did you review those?

12       A.    I reviewed wiring and

13  circuit diagrams.  I don't recall if

14  this -- I do not -- I think they were

15  included in other production.

16       Q.    Well, let's be clear.  Did

17  you review the wiring diagrams that

18  are -- I'm having trouble picking up

19  the -- oh, there we go.

20            Did you review wiring

21  diagrams that, contained in the Ellis

22  0500 to 0647 collection of pages, and

23  these wiring diagrams are specifically

24  marked Ellis 0634, 0635 and 0636?  Did

Christoph J. Flaherty, P.E.

1    you review those?

2           A.    I don't remember.

3           Q.    Are you familiar with the

4    device known as a thermal protector?

5           A.    In general, yes.

6           Q.    In the context of this case

7    and the issues of this case, do you know

8    what I mean when I refer to a thermal

9    protector?

10          A.    Yes.

11          Q.    Are you aware that at some

12   point in time the type of refrigerator

13   involved in this case came to have a

14   thermal protector in the light bulb

15   circuit?

16          A.    Yes.

17          Q.    How does a thermal protector

18   operate?

19          A.    In general it has a

20   particular setpoint at which it will

21   interrupt the flow of electricity.

22   Depending on the type of thermal

23   protector it can be a -- we would refer

24   to it as a single-shot device which means

Christoph J. Flaherty, P.E.

1    it operates once and then renders the

2    circuit it's in inoperable until it's

3    replaced, or it could be a resettable

4    device where it would operate when it

5    gets too hot and then reset once it cools

6    down.

7         Q.    You mentioned a setpoint.

8    Is that a temperature setpoint?

9         A.    Yes.

10        Q.    And is the idea that you use

11   a thermal protector that triggers opening

12   a circuit before the device it's

13   protecting reaches a temperature that

14   could cause a problem?

15        A.    Yes, that would be the

16   intent.

17        Q.    So in the light bulb circuit

18   for a refrigerator, given the problems

19   that were experienced in some of the

20   earlier models of refrigerator, you have

21   a thermal protector that's set at a

22   temperature that's lower than the

23   temperature at which the light bulb could

24   cause combustion; fair statement?

Christoph J. Flaherty, P.E.

1         A.    You would have to make some
2    judgment call as to what that temperature
3    would be, but that would be the -- that
4    would be a consideration to certainly
5    make in order to choose a proper
6    setpoint.
7         Q.    So if that was done and a
8    thermal protector was added to the light
9    circuit and the setpoint was appropriate
10   for the protection being sought, if the
11   refrigerator light stayed on for whatever
12   reason, sticking relay or some other
13   fault or something wrong with the switch
14   in the door, the thermal protector would
15   de-energize the circuit before the light
16   bulb got hot enough to ignite anything,
17   correct?
18             MR. McGLYNN:  Objection.
19             THE WITNESS:  If it's
20        properly selected in terms of
21        setpoint and properly installed
22        and is continuing to function
23        properly, then yes, that is
24        correct.

Christoph J. Flaherty, P.E.

1    BY MR. VOTER:

2          Q.    Okay.  Do you know what the

3    setpoint for the thermal protector that

4    was added to this line of refrigerators

5    was?

6          A.    No, I don't.

7          Q.    Do you know if it was single

8    shot or resettable?

9          A.    No, I don't.

10         Q.    Is it your opinion that the

11   thermal protector that was selected for

12   this line of refrigerators was

13   inappropriate in some way?

14         A.    Not -- I can't eliminate

15   that possibility, but I do not have that

16   as an opinion.

17         Q.    Well, as you sit here today,

18   you have no information that the thermal

19   protector that was added to the line of

20   refrigerators was improper or

21   inappropriate in any fashion; fair

22   statement?

23         A.    Yes, that's right.

24         Q.    For the interior light bulb

Christoph J. Flaherty, P.E.

1    to start a fire, it would have to get hot

2    enough to ignite something combustible

3    that was close enough to ignite, right?

4          A.    Yes.

5          Q.    And if the thermal protector

6    was properly selected, the light bulb

7    should never be able to reach that

8    temperature, because the thermal

9    protector would de-energize the circuit

10   before it got hot enough, correct?

11         A.    Assuming that it's also

12   properly installed and its function

13   hasn't degraded in any way, yes.

14         Q.    You said in your report on

15   Page 4, and I'll quote, "The Ellis's

16   refrigerator was manufactured without

17   thermal protection" and then, "and with

18   the original relay."

19               So let me focus on the first

20   part of that sentence, "the Ellis's

21   refrigerator was manufactured without

22   thermal protection."  Is that correct?

23         A.    No.  That was a mistake on

24   my part.

Christoph J. Flaherty, P.E.

1          Q.     And how did you discover

2     that you had made that mistake?

3          A.     In reviewing defense

4     expert's report.

5          Q.     Did the report that you're

6     referencing also include a photograph of

7     the thermal protector?

8          A.     Yes.  It included a

9     photograph of light bulb circuitry and

10    the thermal protector included in that.

11         Q.     Do any of the documents you

12    were provided answer the question of

13    whether the Ellis refrigerator was

14    manufactured with a thermal protector?

15              MR. McGLYNN:  Objection.

16              THE WITNESS:  I went back

17         after reviewing defense expert's

18         report to attempt to figure out

19         the -- well, what happened is I

20         was confused about the timeline

21         and the date of manufacture of the

22         refrigerator.  So the

23         documentation that I reviewed does

24         show the installation of thermal

Christoph J. Flaherty, P.E.

1        protection in refrigerators

2        manufactured in Korea just prior

3        to the date of manufacture of this

4        refrigerator, and I made a mistake

5        I think in either interpreting the

6        timeline or the date of

7        manufacture.

8   BY MR. VOTER:

9        Q.    So we can agree that

10  notwithstanding what your report says,

11  this refrigerator was manufactured with a

12  thermal protector, agreed?

13       A.    Yes.

14       Q.    And did you also make a

15  mistake during your evidence exam in not

16  recognizing the thermal protector?

17            MR. McGLYNN:   Objection.

18            THE WITNESS:   The -- at the

19       time of my evidence exam, the

20       circuitry had been removed from

21       the refrigerator, and I did not

22       specifically note the thermal

23       protector during that evidence

24       exam either.

```
1     BY MR. VOTER:
2          Q.     Having seen the photograph
3     that was in Mr. Nemeth's report,
4     N-e-m-e-t-h, did you recall seeing it
5     even if you didn't identify or recognize
6     what it was?
7          A.     I did not recall seeing it,
8     but I'm sure that it was there.
9          Q.     Okay.  As you sit here right
10    now, sir, do you have any evidence that
11    the light bulb in the Ellis refrigerator
12    experienced a condition where it stayed
13    on even though the doors were closed?
14         A.     It is one of two, one of my
15    two potential identified ignition sources
16    in the top of that refrigerator.  As I
17    spelled out, I wasn't able to determine
18    specifically whether it was an issue with
19    the light or an issue with the circuit
20    with the electrical arcing that caused
21    the particular fire at the Ellis
22    residence.  It's my opinion that it was
23    one of those two.
24         Q.     Well, in order for it to be
```

Christoph J. Flaherty, P.E.

1    the light bulb, there has to be -- there

2    has to be some problem where the light

3    bulb stays on even though the doors are

4    closed, right?

5          A.    Yes.

6                MR. McGLYNN:  Objection.

7                THE WITNESS:  Or the doors

8          weren't entirely closed.

9    BY MR. VOTER:

10         Q.    Is there any evidence that

11   the doors were not closed just before the

12   fire?

13         A.    No.

14         Q.    Is there any evidence that,

15   aside from what you identified as a

16   possibility or potential, I'm asking

17   about hard evidence, testimony,

18   documents, physical evidence, is there

19   any evidence that you're aware of as you

20   sit here right now that the light bulb in

21   the Ellis refrigerator would stay on even

22   though the doors were closed?

23         A.    Nothing specifically

24   sufficient to allow me to determine that

Christoph J. Flaherty, P.E.

1    that is the sole fire cause.

2          Q.    Is there any evidence that

3    it stayed on when the doors were closed?

4          MR. McGLYNN:  Objection.

5          You can answer.

6          THE WITNESS:  Both the

7          occurrence of the fire in the top

8          portion of the refrigerator and

9          the arcing on the circuit in the

10         top portion of the refrigerator

11         are evidence that the fire started

12         in the top portion of the

13         refrigerator leaving the light as

14         a potential ignition source.

15   BY MR. VOTER:

16         Q.    Okay.  I understand that.

17   You've said that.  My question is, is

18   there any evidence that you're aware of

19   that when the Ellis refrigerator doors

20   were closed the light bulb stayed on?

21         A.    There is nothing specific.

22   I can't say that it definitely was on.  I

23   have no -- yeah.

24         Q.    Do you have any evidence,

Christoph J. Flaherty, P.E.

1    aside from speculation, do you have any

2    evidence that the thermal protector was

3    installed improperly?

4              MR. McGLYNN:  Objection.

5         Would you like to rephrase that?

6              MR. VOTER:  No.  He can

7         answer the question.

8              MR. McGLYNN:  Objection;

9         form, speculation, the

10        characterization.

11             MR. VOTER:  No, I'm actually

12        asking him not to speculate.

13   BY MR. VOTER:

14        Q.    You understand the

15   difference between speculation and

16   evidence, correct?

17             MR. McGLYNN:  Objection.

18             THE WITNESS:  I don't have

19        any positive indication to show

20        that the thermal protector was

21        installed improperly, although

22        based on the degree of damage,

23        that would remain a possibility.

24        I can't confirm that it was

Christoph J. Flaherty, P.E.

1          installed properly either.

2    BY MR. VOTER:

3          Q.     Well, do you have any

4    evidence that it was installed improperly

5    ten years before this accident, before

6    this fire when the refrigerator was made?

7          A.     No.

8          Q.     Do you have any evidence

9    that it had degraded by the time the fire

10   occurred and that that played some role

11   in this fire?

12         A.     No.

13         Q.     How did the light bulb come

14   into contact with something combustible?

15             MR. McGLYNN:   Objection;

16         foundation.

17             THE WITNESS:   Something

18         by -- I don't know specifically,

19         but as I said in the report, food

20         storage in the refrigerator could

21         come into contact with it.

22   BY MR. VOTER:

23         Q.     Okay.  But you don't know

24   what storage containers were in the

Christoph J. Flaherty, P.E.

1    refrigerator, right?

2         A.    That's right.

3         Q.    You don't know what they

4    were made of if there were any in there,

5    right?

6         A.    That's right.

7         Q.    You don't know where they

8    were located in the refrigerator if they

9    were in there, correct?

10              MR. McGLYNN:  Objection.

11              THE WITNESS:  Which is why

12         we didn't attempt to do any

13         testing along those lines.

14   BY MR. VOTER:

15        Q.    Well, more important, if

16   they're not close enough to the light

17   bulb to ignite, even if somehow the light

18   bulb gets hot enough, then that theory

19   doesn't work, correct?

20              MR. McGLYNN:  Objection.

21              THE WITNESS:  Yes.  It

22         wasn't lying sufficiently close to

23         the light bulb to ignite.

24   BY MR. VOTER:

Christoph J. Flaherty, P.E.

1      Q.    Okay.  And you have no

2  evidence that that was the case, correct?

3            MR. McGLYNN:  Objection.

4            THE WITNESS:  No.

5  BY MR. VOTER:

6      Q.    No, it's not correct, or

7  yes, it's correct?

8      A.    No, I don't have any

9  evidence of specifically what might have

10 been close enough to the light bulb to.

11     Q.    Okay.  And you would need

12 that evidence in order to state to a

13 reasonable degree of engineering

14 certainty that the light bulb caused the

15 ignition, agreed?

16           MR. McGLYNN:  Objection.

17           THE WITNESS:  My opinion is

18           that it's one of the possible, one

19           of the two potential failures that

20           caused the fire, that I was not

21           able to within a reasonable degree

22           of engineering or scientific

23           certainty determine which one of

24           those two it was.

Christoph J. Flaherty, P.E.

1    BY MR. VOTER:

2        Q.    Okay.  That's not really my

3    question.  My question is, are you

4    able -- if you don't know -- if you're

5    unable to say what combusted, what it was

6    made of and where it was located in

7    relation to the light bulb, would you

8    agree that you're not able within a

9    reasonable degree of engineering

10   certainty to say that the light bulb

11   caused the fire?

12              MR. McGLYNN:  Objection.

13   BY MR. VOTER:

14       Q.    Do you agree?

15       A.    Yes.

16       Q.    Go back to the service

17   flash.  Do you have it?

18       A.    Yes.

19       Q.    Do you see on the first page

20   that there are, it looks like an Excel

21   spreadsheet towards the bottom that

22   identifies different model numbers and on

23   the right column PCV part numbers?  Do

24   you see that?

Christoph J. Flaherty, P.E.

1    A.    Yes.

2    Q.    And would you agree that

3  there are several, it looks like six, six

4  different PCV part numbers?

5    A.    Yes.

6    Q.    Do you know which one was in

7  the Ellis refrigerator at the time of the

8  fire?

9    A.    I would have to review.  I

10  think I called it out in my report.  I

11  don't remember it off the top of my head.

12    Q.    Okay.  So can we just make

13  this part of the deposition easy and

14  agree that even though it was made with

15  the smaller relay, that the Ellis

16  refrigerator had been retrofitted with a

17  circuit board that had the larger relay

18  in the light bulb circuit?

19          MR. McGLYNN:  Yeah.  I mean,

20          just a second before you answer,

21          we can agree that it's a larger

22          relay.  I just object to the

23          larger relay, you know, pursuant

24          to whatever -- it had the larger.

Christoph J. Flaherty, P.E.

1          MR. VOTER:  Okay.  I

2      appreciate that, but I don't know

3      why the limitation, so let me go

4      through it.

5  BY MR. VOTER:

6      Q.    So what do you know about

7  repairs made to the Ellis refrigerator

8  after it was purchased?

9      A.    I knew that there was a

10  repair to the ice maker because the

11  Ellises were experiencing some issues

12  with that.

13      Q.    Anything else?

14      A.    And then that the service

15  flash maintenance was also performed on

16  the Ellis's refrigerator.

17      Q.    Okay.  And it would be fair

18  to say if the service flash service is

19  performed properly, a new circuit board

20  will be installed in place of the

21  original; is that correct?

22      A.    Yes.

23      Q.    Okay.  And is it your

24  understanding that that is what occurred

Christoph J. Flaherty, P.E.

1        in the Ellis's refrigerator?

2                A.      Yes.

3                Q.      And do you know what the

4        date of that was?

5                        MR. McGLYNN:  The date of

6                the work?

7                        MR. VOTER:  Yes.

8                        THE WITNESS:  I have the

9                date of completion of the service

10               flash as February 28th, 2009.

11       BY MR. VOTER:

12               Q.      And can we agree that as a

13       result of that service flash, a new

14       circuit board was installed in the

15       Ellis's refrigerator that had the larger

16       relay -- had a larger relay in the number

17       four spot indicating that it was for the

18       light bulb circuit?

19               A.      Yes.

20               Q.      And that would have been how

21       many years before the fire?

22               A.      Let's see, 2009, so is that

23       maybe ten?

24               Q.      After that service are you

Christoph J. Flaherty, P.E.

1    aware of any problems that the Ellises

2    reported regarding their refrigerator?

3            A.    No.

4            Q.    Do you recall me asking them

5    in their deposition if they had had any

6    problems?

7            A.    Yes.

8            Q.    And what was their answer?

9            A.    They said they had not.

10           MR. VOTER:    Okay.   Let me go

11       back to your file materials.

12           Joe, I think maybe the

13       quickest way to do this if it's

14       okay with you is I'm going to

15       print the e-mail you sent me with

16       the Dropbox link in it, and I'm

17       going to mark it as an exhibit,

18       and then we'll know that

19       everything that you sent to me in

20       that link represents the contents

21       of Mr. Flaherty's file.   Does that

22       sound like it would work?

23           MR. McGLYNN:   Yes.   We have,

24       just for the record, you both

1         agree that you're looking at the

2         same contents, right?  It sounded

3         like you went through that, right?

4               MR. VOTER:  Yeah, I think we

5         already did that.

6               THE WITNESS:  Yes.

7               MR. VOTER:  So Flaherty-1

8         will be his November 6, 2020,

9         report.  Flaherty-2 will be the

10        CV.  Flaherty-3 will be his list

11        of testimonies.

12              Now, I'm going to mark the

13        e-mail from Joe McGlynn to me from

14        today at 10:19 a.m. which has a

15        Dropbox link in it, and that link

16        is to the entirety of Mr.

17        Flaherty's file, and that's going

18        to be 5, Flaherty-5.  There is

19        something wrong with my printer,

20        so it's got that weird skid mark

21        on there.

22              (Exhibits Flaherty-1 through

23        Flaherty-3 and Exhibit Flaherty-5

24        were marked for identification.)

Christoph J. Flaherty, P.E.

```
 1    BY MR. VOTER:
 2         Q.    Okay.  Does your report
 3    which is marked as Flaherty-1, does that
 4    summarize the opinions that you intend to
 5    offer in this case?
 6         A.    With the exception of the
 7    change that we discussed regarding the
 8    presence of a thermal protector, yes.
 9         Q.    Are there any opinions that
10    you intend to offer in this case that are
11    not included in this report other than
12    what you just referenced?
13         A.    No.
14         Q.    Did you look at Mr.
15    Ferrese's evidence exam photos at any
16    point in your involvement with this case?
17         A.    Yes.
18         Q.    Did his evidence exam photos
19    show the presence of the thermal
20    protector?
21         A.    I don't recall.  I don't --
22    I didn't go back to his evidence exam
23    photos to see if I could find it
24    specifically after I realized that one
```

Christoph J. Flaherty, P.E.

```
 1    was installed.
 2           Q.    Do you know Mr. Ferrese?
 3           A.    Yes.
 4           Q.    What's his area of
 5    expertise?
 6           A.    He's an electrical engineer.
 7           Q.    Did you replace Mr. Ferrese
 8    in this matter?
 9           A.    I think so.
10           MR. McGLYNN:  Objection.
11    BY MR. VOTER:
12           Q.    Do you know why?
13           A.    No, I don't.
14           Q.    Did you know at the time
15    that you were retained that a lawsuit had
16    already been filed against my client by
17    Allstate alleging that the refrigerator
18    was defective?
19           A.    No, I don't -- I don't think
20    I knew that.  I don't know when the
21    lawsuit was filed.
22           Q.    When did you begin receiving
23    materials about the lawsuit?
24           A.    About the lawsuit, I mean, I
```

newcomer

1    received materials about the case.

2         Q.    That's what I mean.

3         A.    I'd have to look that up.  I

4    think it was in January of 2020, but I'd

5    have to look at my correspondence to see

6    when I actually received those.

7         Q.    Did the materials you

8    received include discovery responses from

9    my client?

10        A.    Yes.

11        Q.    And did those discovery

12   responses indicate the caption, what

13   lawyers call caption of the case?

14        A.    Yes.  Discovery responses

15   would indicate that a lawsuit had been

16   filed.

17        Q.    By Allstate and against LG

18   Electronics US?

19        A.    Yes.

20        Q.    Is it fair to say that

21   before you did your evidence exam you

22   knew what Allstate's position was with

23   regard to the start of this fire?

24             MR. McGLYNN:  Objection;

Christoph J. Flaherty, P.E.

1          foundation.

2                    MR. VOTER:  Well, okay.

3     BY MR. VOTER:

4          Q.    Can we agree that before you

5     did your evidence exam you knew there was

6     a lawsuit brought by Allstate against LG

7     Electronics USA, agreed?

8          A.    No.  I don't think -- I

9     don't know if I appreciated that at the

10    time.  I did receive materials.  I don't

11    remember exactly when I received those

12    materials.  And at the time of my

13    evidence exam, I did not know what either

14    Allstate's or Mr. Ferrese's position was

15    regarding any issues with the

16    refrigerator.

17         Q.    At the time that you did

18    your evidence exam on February 5, 2020,

19    did you have any information in your file

20    that would indicate Allstate had sued LG

21    Electronics US?

22         A.    I don't -- I don't remember.

23         Q.    Okay.

24         A.    At the time --

Christoph J. Flaherty, P.E.

1          Q.     Go ahead.

2          A.     I was just going to say, I

3     know at the time of the evidence exam, I

4     knew that Mr. Buckley, he had

5     communicated to me that his opinion was

6     that the fire started inside the

7     refrigerator.

8          Q.     Did you ever speak to Mr.

9     Ferrese?

10         A.     No.  Well, yes, but not in

11    preparation for this case.  I've run into

12    him in other matters.

13              MR. McGLYNN:  Well, I mean,

14         you haven't talked to him about

15         this case, right?  I mean, that's

16         just so we're clear.

17              THE WITNESS:  Right.

18    BY MR. VOTER:

19         Q.     Does your file include your

20    invoices?

21         A.     No.

22         Q.     Do you know how much you

23    have billed on this file?

24         A.     I can look it up.  I don't

Christoph J. Flaherty, P.E.

```
 1    know off the top of my head.  I guess I
 2    would estimate between 5 and $10,000.00,
 3    but I don't know exactly.
 4          Q.    What's your hourly rate?
 5          A.    It's currently $290.00 an
 6    hour.
 7          Q.    So if I wanted to know the
 8    number of hours you had devoted to the
 9    case, I could just divide 5,000 or 10,000
10    by 290 and get something close?
11          A.    Yes.  I could also provide
12    the actual invoices.  I just didn't --
13          MR. McGLYNN:  Yeah.  Well,
14          can you tell us?  Is it easy
15          enough -- sorry, Warren.  I'm
16          sorry for interrupting you.
17          Is it easy enough to tell us
18          how much you billed?
19          THE WITNESS:  Yeah.  Let me
20          look it up.
21          Okay.  So it looks like I'm
22          behind on some of my billing here.
23          So I've billed, what would that
24          be, 9,700, so pretty close to
```

1          $10,000.00.  And I should rephrase

2          that.  I haven't billed that much.

3          That's how much I have worked

4          because the -- I haven't sent out

5          the most recent invoice which

6          includes probably about half of

7          those hours.

8     BY MR. VOTER:

9          Q.    When were you hired in this

10    case?

11         A.    In -- let's see.  I think

12    that's -- I usually write that as the

13    first sentence in my report.

14              January 24th, 2020.

15         Q.    Who hired you?

16         A.    Mr. McGlynn or someone in

17    his office.  I don't remember who

18    specifically the first contact was with.

19         Q.    Have you worked with Mr.

20    McGlynn on other cases?

21         A.    Yes.

22         Q.    How many?

23         A.    Five to ten.

24         Q.    You worked with Mr.

Christoph J. Flaherty, P.E.

1    McGlynn's law firm on other occasions in

2    addition to or beyond the five to ten

3    with Mr. McGlynn?

4         A.    Yes.

5         Q.    How many would you say with

6    the de Luca Levine firm that aren't with

7    Mr. McGlynn?

8         A.    In total over the years?

9         Q.    Yes.

10        A.    I would estimate 50.  That

11   would be a ballpark.

12        Q.    And have you worked with

13   Allstate -- have you worked for Allstate

14   before?

15        A.    Yes.

16        Q.    You know what, you probably

17   understood what I was driving at, but my

18   question might not have been as clear as

19   I thought.  So instead of using the word

20   "before," let me just go back through

21   your answer.

22             Are you saying that you have

23   worked with Mr. McGlynn on other, on five

24   to ten other cases besides this one?

Christoph J. Flaherty, P.E.

1        A.     Correct.

2        Q.     And you've worked with his

3   law firm on roughly 50 matters other than

4   the five to ten you've worked with Mr.

5   McGlynn on, correct?

6        A.     Yes.

7        Q.     And have you worked on other

8   matters for Allstate besides this one?

9        A.     Yes.

10        Q.     How many?

11        A.     I have no idea, but it's

12   quite a few.

13        Q.     More than 50?

14        A.     Yes.

15        Q.     More than 100?

16        A.     Over the years we're

17   talking?

18        Q.     Yes.

19        A.     So since I've been doing

20   this on my own for the last ten or so

21   years, let's see, I would say Allstate

22   has off and on been one of my larger

23   clients in comparison to other insurance

24   companies.  So, yeah, I would say 100 to

Christoph J. Flaherty, P.E.

1        200 is probably a pretty good estimate.

2              Q.     100 to 200 in roughly a

3        ten-year span?

4              A.     Ten-year period.

5              Q.     What percentage of cases

6        you've worked on in the last five years

7        have been plaintiff versus defendant?

8              A.     I think it has trended, I've

9        done both, I think it has trended more

10       towards plaintiff.   So I would estimate

11       60 to 70 percent subrogation work.

12             Q.     Which is what this is,

13       correct?

14             A.     Yes.

15             Q.     And when you say

16       "subrogation work," meaning you're on the

17       side that's trying to recover money?

18             A.     I'm working on behalf of the

19       insurance company who is looking -- whose

20       interest is recovering money for their

21       claim, yes.

22             Q.     How many active cases do you

23       have currently?

24             A.     That kind of depends on how

Christoph J. Flaherty, P.E.

```
 1    we would define active.  Many cases go
 2    dormant for a year or two and then
 3    resurface.
 4            Q.    I'll say open.  Open is a
 5    better word.
 6            A.    I would estimate completely
 7    around 50 to 60 open.
 8            Q.    Does Flaherty Engineering
 9    Investigation perform any work that's not
10    claim/lawsuit related?
11            A.    I've done -- well, I guess
12    personal plaintiff work would also be
13    considered lawsuit related.  All of
14    Flaherty Engineering's work is in
15    forensic investigations focusing on
16    insurance claims or legal cases.
17            Q.    What did you earn in 2019
18    from your forensic work?
19            A.    In terms of gross income?
20            Q.    Sure.
21            A.    Let's see.  I don't remember
22    exactly, but it's in the between 350,000
23    and $380,000.00, in that range.
24            Q.    How many employees does
```

Christoph J. Flaherty, P.E.

```
1        Flaherty Engineering have?
2            A.    Just myself.
3            Q.    Do you have a lab?
4            A.    I -- not personally.  I
5    contract with organizations in order to
6    provide laboratory space when it's
7    required.
8            Q.    Do you have an office or do
9    you work out of your home?
10           A.    I have a home office.
11           Q.    What percentage of your open
12   files are fire related?
13           A.    Approximately 80 percent.
14           Q.    Are you a CFI?
15           A.    No.
16           Q.    Are you a CFEI?
17           A.    I have previously been a
18   CFEI.  My certification is not current.
19           Q.    When did you become
20   certified CFEI something?
21           A.    I was initially qualified in
22   2004.  My certification lapsed I think in
23   2017, and I've perpetually intended to
24   recertify it.  I just haven't managed to
```

Christoph J. Flaherty, P.E.

1    make that happen yet.

2           Q.    Do you hold yourself out as

3    an expert in fire cause and origin?

4           A.    As an expert in fire cause

5    and origin as relates to electrical

6    systems and -- yes.  Not -- I would not

7    hold myself out as a fire investigator

8    per se.

9           Q.    Have you ever worked for a

10   manufacturer of refrigerators?

11          A.    I don't think so.

12          Q.    Have you ever designed a

13   refrigerator?

14          A.    Oh, I understand your

15   question now.  I'm sorry.  Your earlier

16   question I had interpreted to be if I had

17   ever worked as a forensic investigator on

18   behalf of a refrigerator manufacturer,

19   but I think the question you actually

20   asked was had I ever worked for a

21   refrigerator manufacturer.

22          Q.    Correct.

23          A.    And the answer to that is

24   no.

Christoph J. Flaherty, P.E.

1           Q.    Have you ever designed a
2      refrigerator?
3           A.    No.
4           Q.    Have you ever designed a
5      component that was used in a
6      refrigerator?
7           A.    No.
8           Q.    Have you ever served on any
9      committee that deals with refrigerator
10     design or manufacture?
11          A.    No.
12          Q.    Have you ever designed any
13     home appliance?
14          A.    No.
15          Q.    Well, now I'll ask the
16     question that you initially thought I was
17     asking.  Have you ever been retained by a
18     refrigerator manufacturer in a forensic
19     matter?
20          A.    I don't recall a case in
21     which I have been.
22          Q.    Have you been offered in --
23     go ahead.
24          A.    I just remembered I was

Christoph J. Flaherty, P.E.

1    retained on behalf of a heating element

2    manufacturer of heating elements used in

3    refrigerators and freezers, but not I

4    don't think a refrigerator manufacturer.

5            Q.    Was that one time or more

6    than one time?

7            A.    One time for that particular

8    application.  I say that because that

9    manufacturer also makes heating elements

10   in dishwashers for example.

11           Q.    Who was the -- what was the

12   manufacturer of that heating element?

13           A.    Backer Heating Technologies.

14           Q.    And did you offer an opinion

15   in that matter?

16           A.    There have been two, one

17   involving the heating element in a

18   dishwasher and one involving the heating

19   element in the door of a commercial

20   walk-in freezer or refrigerator.  I can't

21   remember which it was.

22           Q.    Did you offer an opinion in

23   the refrigerator or freezer case?

24           A.    Those -- that investigation

Christoph J. Flaherty, P.E.

1   is ongoing.  I haven't officially offered

2   any opinions for it.  We have had

3   examinations and discussions regarding

4   what those mean.

5          Q.    Okay.  Other than in this

6   case, have you ever written a report in

7   which you expressed an opinion that a

8   refrigerator was defective?

9          A.    I don't think so.

10          Q.    Have you ever had other

11   cases involving refrigerators other than

12   the one, the walk-in freezer fridge that

13   you just referred to?

14          A.    Yes.

15          Q.    How many have you had?

16          A.    Can you -- I want to narrow

17   this down just a little bit.  Cases in

18   which a refrigerator was being considered

19   as a potential fire origin?

20          Q.    Well, I'd rather not narrow

21   it down yet.  I'd rather keep it broad,

22   but I can --

23          A.    Through kitchen fire I've

24   done freezers and refrigerators, so that

Christoph J. Flaherty, P.E.

1    would be quite a number.

2          Q.    Okay.

3          A.    Most of them the

4    refrigerator is not considered a

5    potential ignition source based on the

6    fire investigator's investigation.

7          Q.    So are you saying that

8    you've been retained on kitchen fires

9    where there was a refrigerator present,

10   but in the end the refrigerator was not

11   blamed for the fire?

12         A.    Correct.

13         Q.    Okay.  Let me ask then, have

14   you ever been involved in a case where,

15   other than this one, where the

16   refrigerator was being blamed for the

17   fire?

18         A.    Yes.

19         Q.    And in those cases, have you

20   been the person blaming the refrigerator

21   for the fire?

22               MR. McGLYNN:  Objection.

23               THE WITNESS:  In the -- in

24         the one other case that I can

Christoph J. Flaherty, P.E.

 1          think of, the fire -- I assisted a

 2          fire investigator in determining

 3          that the origin of the fire was

 4          inside the refrigerator.  Due to

 5          the fact of that particular case,

 6          they didn't decide to attempt to

 7          pursue that subrogation against

 8          the refrigerator manufacturer, so

 9          it never progressed to a finding

10          of a particular defect within the

11          refrigerator.

12     BY MR. VOTER:

13          Q.    What brand of refrigerator

14     was that?

15          A.    I don't know, and I don't

16     think we knew at the time either.

17          Q.    How long ago was this?

18          A.    Probably two or three years

19     ago.

20          Q.    Is that file closed as far

21     as you know?

22          A.    Yes.

23          Q.    Who was the other

24     investigator that you assisted?

Christoph J. Flaherty, P.E.

1          A.      I assisted Joe Sobota who is

2     a fire investigator.

3          Q.      Did you determine what the

4     cause of that fire was?

5          A.      Not other than it had

6     started in the refrigerator and that

7     causes associated with the refrigerator

8     wiring would need to be investigated

9     where at the point a manufacturer would

10    have to be notified, put on notice, and

11    then joint examinations planned when the

12    investigation was decided not to be

13    pursued and shut down.

14         Q.      Was there damage outside of

15    the refrigerator --

16         A.      Yes.

17         Q.      -- in that matter?

18         A.      Yes.

19         Q.      Was a location within the

20    refrigerator identified as the point of

21    origin?

22         A.      Within -- I think it was

23    basically within the center of the

24    refrigerator.  I can't -- I can't

Christoph J. Flaherty, P.E.

1    remember.  I think this one had a freezer

2    compartment on the top, so my

3    recollection is just the sort of center

4    of the structure of the refrigerator, but

5    it could have been more towards the top

6    side of the refrigeration compartment.

7    It was definitely within the

8    refrigeration compartment.

9          Q.    Do you know what industry

10   standard relates to the design of a

11   refrigerator like the one involved in the

12   Ellis case?

13         A.    I'm sure there are UL

14   standards that relate to the refrigerator

15   manufacture, but I don't know the

16   specific one.

17         Q.    Okay.  But by specific one,

18   I'd like to ask specifically.

19         A.    Joe is --

20         Q.    Do you know the number of

21   the -- oh, what's the matter?

22              (Mr. McGlynn lost audio

23   connectivity.)

24              MR. McGLYNN:  Sorry about

Christoph J. Flaherty, P.E.

1          that.
2     BY MR. VOTER:
3          Q.    I think I was asking about
4     the standard that applies to refrigerator
5     design and manufacture.  Do you know what
6     the number of that standard is?
7          A.    No.
8          Q.    Are you aware of whether the
9     organization that issues the standard
10    that applies to the design of
11    refrigerators approved the design of the
12    Ellis's refrigerator?
13         A.    My understanding is that it
14    was UL listed, so then it would have been
15    approved.
16         Q.    Have you ever performed any
17    testing on a refrigerator?
18         A.    No.
19         Q.    I assume you own a
20    refrigerator?
21         A.    Yes.
22         Q.    What brand is it?
23         A.    I think it's a KitchenAid.
24         Q.    I assume you've never

Christoph J. Flaherty, P.E.

```
 1      authored any articles on refrigerator
 2      design or fires.  Is that a fair
 3      statement?
 4              A.    Yes.
 5              Q.    Have you ever been precluded
 6      from testifying by a court?
 7              A.    No.
 8              Q.    Have you ever given a
 9      seminar or presentation to Allstate on
10      any topic?
11              A.    No.
12              Q.    Have you ever given a
13      presentation to any group or organization
14      on appliance fires?
15              A.    I did one talk with
16      representatives of I think State Farm
17      focusing on forensic investigations in
18      general.  I believe appliance fires was a
19      covered topic in that.
20              Q.    You used the term "defect"
21      and "defective," I forget which, in your
22      complaint when describing the
23      refrigerator at issue.  Do you recall
24      that?
```

Christoph J. Flaherty, P.E.

1          A.     Yes.

2          Q.     What does -- how do you

3     define defect?

4          A.     As an error in either the

5     manufacture or the design that would lead

6     to damage or malfunction of the

7     appliance.

8          Q.     Do you distinguish between a

9     design defect and a manufacturing defect?

10              MR. McGLYNN:  The question

11         was did you or do you?

12              MR. VOTER:  Do you.

13              MR. McGLYNN:  Based on this

14         case obviously.

15              THE WITNESS:  Yes.

16    BY MR. VOTER:

17         Q.     Let's talk about your other

18    opinion having to do with the arc on the

19    wiring harness.  Was that -- you've

20    identified that as a defect in this

21    refrigerator, correct?

22         A.     I've identified that as a,

23    either a cause or a symptom of the fire

24    in the top of this refrigerator.

Christoph J. Flaherty, P.E.

1          Q.     I stand corrected.  You've

2    identified it as one of two potential

3    causes of the fire, correct?

4          A.     Correct.

5          Q.     Okay.

6          A.     And if it was the cause,

7    then that would represent being due to a

8    defect in the manufacture of the

9    refrigerator.

10         Q.     Okay, fine.  So you said a

11   defect in the manufacture of the

12   refrigerator, and I want to be very

13   clear.  You're distinguishing between --

14   you're specifically using the word

15   "manufacture" as opposed to the design,

16   correct?

17         A.     Yes.

18         Q.     What was the manufacturing

19   defect as it related to the wiring

20   harness?

21         A.     Its installation that would

22   subject it to physical damage, either

23   damage done during manufacture or a

24   routing issue or error that caused the

Christoph J. Flaherty, P.E.

1    insulation to be subject to physical

2    damage after manufacture.

3         Q.    With respect to the wiring

4    harness, am I correct that you're not

5    critical of the design of the

6    refrigerator?

7         A.    That's correct.

8         Q.    Your only criticism

9    potentially is that the wiring harness

10   was installed improperly or that there

11   was a routing error that would do what?

12        A.    Subject it to physical

13   damage, subject the wiring insulation to

14   physical damage.

15        Q.    Okay.  What is the

16   difference between those two?

17             MR. McGLYNN:  Objection.

18   BY MR. VOTER:

19        Q.    Well, you stated that

20   installation error or a routing error.

21   What's the difference between the two

22   things?

23        A.    Well, installation would be

24   general routing as just the specific

Christoph J. Flaherty, P.E.

1    example of an installation error.

2         Q.    How many years before the

3    fire was the refrigerator manufactured?

4         A.    12.

5         Q.    Is there any evidence

6    that -- before the fire, are you aware of

7    any evidence that would support an

8    opinion that there was an installation

9    error or routing error in the

10   refrigerator?

11        A.    Absent the occurrence of --

12   you said before the fire, so no.

13        Q.    No evidence before the fire

14   that would support an opinion that there

15   was a manufacturing defect in the

16   refrigerator, fair?

17        A.    Yes.

18        Q.    I'm going to ask you to draw

19   a bird's eye view of the top of the

20   refrigerator as if you're above it

21   looking down.  So basically it's going to

22   be, I don't know if it's a square or a

23   rectangle, but can you draw that, and I'm

24   going to ask you to identify the

Christoph J. Flaherty, P.E.

1     different sides of the refrigerator as

2     being the door side, and then I'm going

3     to ask you to show me the routing of the

4     wiring harness at issue.  Okay?  And then

5     we're going to mark at as Flaherty-6, and

6     I will ask you when we're done to scan it

7     and e-mail it to Mr. McGlynn and I.

8              A.     Okay.

9              Q.     Or send it to Mr. McGlynn

10    who will send it to me.

11                    Actually, can we take a

12             five-minute break while you do

13             that?

14             A.     Yes.

15             MR. VOTER:  Is that okay

16             with everybody?

17             MR. McGLYNN:  Yes.

18             (Recess; 1:24 p.m.)

19             (Resumed; 1:34 p.m.)

20    BY MR. VOTER:

21             Q.     Mr. Flaherty, did you

22    draw -- oh, you've got it on your

23    computer.

24             A.     Is that kind of what you're

Christoph J. Flaherty, P.E.

1    looking for?

2         Q.    Even better.  So I assume F

3    is front?

4         A.    Yes.

5         Q.    You've got left, right,

6    front and back.  And what is in the left

7    front corner area, what is the small

8    rectangle?

9         A.    I put a small rectangle to

10   represent the cutout in the top of the

11   refrigerator that the wiring harness

12   transits through to get to the door.

13        Q.    Okay.  I'll refer to the

14   rectangle in which the little rectangle

15   exists as the refrigerator cabinet, and

16   then you've got the two doors indicated,

17   correct?

18        A.    Yes.

19        Q.    All right.  So how does

20   it -- when the wiring harness exits the

21   cabinet, how does it get into the door?

22        A.    It goes across the hinge and

23   through a series of connectors to connect

24   to the door wiring which goes down into a

Christoph J. Flaherty, P.E.

1    guide or conduit in the door hinge.

2         Q.    Where are these connectors

3    located?

4         A.    Yeah, they're located in

5    that space in between the where it comes

6    out of the refrigerator cabinet, so the

7    area just above the hinge of the door.

8         Q.    And is that what I'll call

9    normal operation?  Are those connectors

10   visible to somebody looking in that area?

11        A.    No.

12        Q.    What prevents them from

13   being visible?

14        A.    They're covered by a plastic

15   shield or guard.

16        Q.    I want you to assume that we

17   can see through the top of the

18   refrigerator and we could see the route

19   that the wiring harness takes from where

20   it enters the cabinet to where it exits

21   the cabinet.  Can you draw what that path

22   is?

23        A.    Yes, I think I can.

24             (Pause.)

Christoph J. Flaherty, P.E.

1        A.      All right.  So this is not

2    perfect.

3        Q.      Okay.

4        A.      In fact, I think I will add

5    one thing just for a little bit of

6    clarity.

7                     (Pause.)

8        A.      Okay.  So in what would be

9    the top right corner as you're looking at

10   it, which would be the back right corner

11   of the refrigerator, I added a small

12   rectangle to indicate the approximate

13   location of the control board

14   compartment, although that control board

15   compartment is down several feet from the

16   top of the refrigerator.

17                And then the straight line

18   of sort of magenta highlight that

19   transits along the back of the

20   refrigerator is supposed to indicate the

21   portion of the wiring harness that is

22   running up the back of the refrigerator.

23   And as it's running up the back, it's

24   also coming a little bit more towards the

Christoph J. Flaherty, P.E.

1    center from where it started.  And then

2    the diagonal more wandering line I guess

3    you could say that extends from the back

4    of the refrigerator to the small

5    rectangular cutout is intended to

6    represent the approximate routing of the

7    wiring harness across the ceiling of the

8    refrigerator, of the cabinet.

9         Q.    Okay.  Are you able to

10   e-mail that to Mr. McGlynn and me?

11        A.    Yes.  Do you want me to do

12   that now?

13        Q.    Yeah, please.  Actually, you

14   know what.  Let me ask you to hold off.

15   I'll probably ask you to make some more

16   marks on it.

17              So at the end opposite of

18   where it exits the cabinet and transits

19   to the hinge or to the door, is the wire

20   harness connected to the circuit board?

21        A.    Yes, there are -- well,

22   there is multiple connections that are

23   part of the wiring harness.  I think two

24   or three of them connect directly to the

Christoph J. Flaherty, P.E.

1    circuit board and one of them connects to

2    other wiring in that same compartment.

3           Q.     The wiring harness is

4    actually a collection of several wires;

5    is that correct?

6           A.     Yes, it is a bundle of

7    wires.

8           Q.     So does that bundle from

9    where it leaves the area of the main

10   circuit board, does that bundle travel

11   within the refrigerator or on the outside

12   of the cabinet?

13          A.     It's inside, inside the

14   cabinet.

15          Q.     And when it gets to the top

16   of the refrigerator cabinet, what

17   direction does it go?

18          A.     It goes across the top, but

19   still inside the cabinet until it gets to

20   the cutout in the vicinity of the door

21   hinge.

22          Q.     Okay.  You have that one

23   section of straight magenta that goes in

24   your two-dimensional diagram.  It goes

Christoph J. Flaherty, P.E.

1    from the right side to the left side,
2    correct?
3        A.    Yes.
4        Q.    And does that represent the
5    actual direction of travel of the wiring
6    harness across the ceiling of the
7    refrigerator?
8        A.    No.  That represents the
9    horizontal travel of the wiring harness
10   while it's coming from the control box up
11   to the level of the ceiling.  So the
12   projection, you know, since this is a
13   top-down view, I can't show the vertical
14   routing of the wiring harness, but that
15   straight line across the back is intended
16   to just represent the horizontal travel
17   of the wiring harness in the portion of
18   where it's traveling primarily vertically
19   from the control box up to the ceiling of
20   the cabinet.
21       Q.    So if you were standing
22   behind the refrigerator and could see
23   through the metal rear of the cabinet,
24   you'd see the wiring harness going mostly

Christoph J. Flaherty, P.E.

1    vertical but also moving horizontally

2    from left to right?

3         A.    Yes, and that straight

4    portion is intended to represent the

5    horizontal component.

6         Q.    And how far from the back

7    right corner of the cabinet is the spot

8    where the wiring harness makes it to the

9    ceiling of the refrigerator cabinet?

10        A.    At the ceiling level, I

11   would say approximately one foot from the

12   corner.

13        Q.    Okay.  And then it uses

14   that, I forgot what you used, wandering,

15   but it's essentially a diagonal line but

16   not necessarily a straight line?

17        A.    Yes, from that point to the

18   cutout near the door hinge.

19        Q.    And what if anything is

20   around the wiring harness between where

21   it reaches the ceiling and where it

22   makes -- and where it exits the cabinet?

23        A.    In that entire area it's

24   encased in the polyurethane foam

Christoph J. Flaherty, P.E.

1   insulation of the refrigerator.

2         Q.    And by encased, you mean

3   it's literally got foam all around it,

4   right?

5         A.    Yes, it should, and there is

6   nothing here to indicate that it didn't.

7         Q.    Does it move?

8         A.    The portions where it's in

9   the foam, it should not move.

10        Q.    And to be fair, you say in

11   your report that the arc on the wire

12   could be a victim or a consequence of the

13   fire and not the cause of the fire,

14   correct?

15        A.    Correct.

16        Q.    And by that you mean if the

17   fire started elsewhere and there was

18   enough heat in the area where the wiring

19   harness was, it could melt the insulation

20   on a wire which would then expose

21   conductors and produce an arc, correct?

22        A.    Correct.

23        Q.    So if you used the

24   refrigerator, opening the door, closing

Christoph J. Flaherty, P.E.

1    the door, nothing is happening to move

2    the wiring harness between where it

3    reaches the ceiling and where it exits

4    the cabinet, correct?

5            A.      Correct.

6            Q.      Okay.

7            A.      How much it's moving when it

8    exits the cavity would depend on the

9    specific routing and installation in that

10   area.

11           Q.      Well, have you ever looked

12   at an exemplar of this model refrigerator

13   to see exactly how that area is designed?

14           A.      If it's designed and

15   installed properly there should be very

16   little if any movement in that area.

17           Q.      Okay.  My question is, did

18   you ever look at an exemplar of this

19   model refrigerator to see how the area

20   where it exits the cabinet and enters the

21   hinge is designed?

22           A.      I looked at the design

23   documents.  I never looked at an

24   exemplar.

Christoph J. Flaherty, P.E.

1         Q.     And in your report you
2    include some photographs that show the
3    area where you believe the arc was
4    located, correct?
5         A.     Correct.
6         Q.     And can you draw on the
7    diagram, Flaherty-6, you've reproduced
8    the area.  I think you did it with a
9    circle or an oval.  Can you reproduce
10   that onto that diagram to show the area
11   where the arc location could have been?
12        A.     Yes.  So I'm trying to get
13   the oval that I'm drawing to line up with
14   what I want it to, and it's -- no, I
15   think that probably isn't -- that's not
16   quite.  There we go.  I think that will
17   probably do it.  Yeah.
18        Q.     Okay.  I guess now can you
19   e-mail that to Mr. McGlynn and myself?
20        A.     Your e-mail address, sir?
21        Q.     It's warren.voter,
22   v-o-t-e-r, @sweeneyfirm,
23   s-w-e-e-n-e-y-f-i-r-m.com.
24        A.     Did you say n-e-y?

Christoph J. Flaherty, P.E.

```
1              Q.    Yes.
2              A.    Okay.  All right.  I
3     neglected to CC myself.
4                    MR. VOTER:  Okay.  Did you
5              get it Joe?  I did.
6                    MR. McGLYNN:  Yeah.
7                    (Exhibit Flaherty-6 was
8              marked for identification.)
9     BY MR. VOTER:
10             Q.    Okay.  Do you mind holding
11    it up again just so I can recall what it
12    looks like?
13             A.    Sure.
14             Q.    Okay.  What is the distance
15    in inches between the two ends of the
16    oval?
17             A.    Well, it's an approximate
18    location, so I can give you an
19    approximation.
20             Q.    Okay.
21             A.    I would say approximately 12
22    inches.
23             Q.    And what's the -- how much
24    of that is outside of the refrigerator?
```

Christoph J. Flaherty, P.E.

1          A.     When you say "outside of the

2     refrigerator," you mean after it

3     transitions?

4          Q.     Yeah, lousy question.  How

5     much of the area encompassed by the oval

6     is wiring harness that's left or that has

7     left the cabinet and is transitioning or

8     transitioned to the hinge?

9          A.     Okay.  So when I drew the

10    wiring harness line on the refrigerator,

11    I only drew the portion that was inside

12    the cabinet, so the line ends right at

13    the cutout.

14         Q.     Understood.

15         A.     The -- my oval would extend

16    in the two to three inches outside the

17    cabinet there.

18         Q.     Okay.  So of the roughly 12

19    inches of oval, three inches of it would

20    be outside of the refrigerator cabinet?

21         A.     The -- yes, the last two to

22    three inches would be outside the middle

23    cabinet of the refrigerator.

24         Q.     And in that two to three

Christoph J. Flaherty, P.E.

1    inches, has it already gotten to the

2    hinge or is it still transitioning to the

3    hinge?

4         A.    No, that would be

5    transitioning to the connectors and then

6    connecting to the wiring which then goes

7    into the hinge.

8         Q.    Okay.  So it connects

9    with -- it connects with wires that go

10   into the hinge or go through the hinge,

11   right?

12        A.    Yes.

13        Q.    And are you certain that the

14   end of the wiring harness at issue ends

15   short of the hinge?

16        A.    Yes.

17        Q.    Okay.

18             MR. McGLYNN:  Objection.

19   BY MR. VOTER:

20        Q.    So the hinge can't have

21   played any role in this, correct, because

22   it hadn't gotten to the hinge yet?

23        A.    No, the motion of the hinge

24   certainly could, but in terms of the

Christoph J. Flaherty, P.E.

1    physical location, the harness ends in a

2    connector in the hinge, in the hinge

3    assembly for the lack of a better term,

4    the plastic guards and covers that

5    covered the structural portions of the

6    hinge.

7          Q.    Okay.  Now, assuming that

8    the arc wasn't the result of the fire,

9    what could the routing error have been?

10   What sort of or what routing error do you

11   envision for the cause of the arc?

12         A.    So possible manufacturing

13   defects in that area leading to the

14   susceptibility for damage would be the

15   inadequate securing of that portion of

16   the wiring harness so that it is subject

17   to movement, and positioning of that

18   wiring harness against edges that could

19   damage it as a result of that movement.

20         Q.    Okay.  Are there any edges

21   that could damage the wire?

22         A.    The edges of the hole that

23   it transitions through coming out of the

24   refrigerator.

Christoph J. Flaherty, P.E.

1     Q.     What's that hole -- what's

2  the material that the wiring harness

3  coming out of the cabinet made of?

4     A.     The material of the wiring

5  harness?

6     Q.     I'm sorry.  I was afraid I

7  got my question mixed up.  The wiring

8  harness comes out of a hole in the top of

9  the refrigerating cabinet, right?

10    A.     Yes.

11    Q.     And is there some sort of

12 grommet or something that creates the

13 hole or provides a, you know, a different

14 surface than just metal?

15    A.     I don't know.  There should

16 be to protect it well.

17    Q.     Okay.

18    A.     The manufacturing issue

19 could be that there was no such

20 protection.

21    Q.     Okay.  Do you have any

22 evidence that there was no such

23 protection at the hole where the wiring

24 harness comes through the cabinet?

Christoph J. Flaherty, P.E.

1                    MR. McGLYNN:  Objection.

2                    THE WITNESS:  Not from

3          anything prior that we took.

4                    I think everybody just froze

5          up.  No.

6     BY MR. VOTER:

7          Q.    I was thinking for a second.

8                    Prior to the fire, was there

9     any evidence that you're aware of that

10    there had been a routing error with the

11    wiring harness?

12                   MR. McGLYNN:  Objection.

13                   THE WITNESS:  No.

14    BY MR. VOTER:

15         Q.    Other than the fire, is

16    there any evidence that the wiring

17    harness had been damaged during

18    installation ten years earlier?

19         A.    No.

20         Q.    I just want to set up my

21    question properly.  Am I correct that if

22    I knew where the arc was at the moment

23    that the arc occurred, I'd know where

24    along that wiring harness line that

Christoph J. Flaherty, P.E.

1   you've drawn, where it was located?  That

2   sounds like a horrible question.

3            Let me try again.  What the

4   oval represents is the area, area of the

5   length or of a section of the wiring

6   harness where the arc location could have

7   been?

8            A.    Yes.

9            Q.    Okay.  So the location where

10  the arc occurred could have been inside

11  the cabinet or it could have been outside

12  of the cabinet, correct?

13           A.    Yes, or right at the

14  entrance to the cabinet.

15           Q.    Right, okay.  And you don't

16  know where the location of the arc was at

17  the moment that the arc occurred?

18           MR. McGLYNN:  Objection.

19           THE WITNESS:  Other than my

20      estimated area, that's right.

21  BY MR. VOTER:

22           Q.    Okay.  And have you done any

23  tests to determine if an arc somewhere on

24  that two-inch segment outside of the

Christoph J. Flaherty, P.E.

1    cabinet could produce a fire inside the

2    cabinet?

3              MR. McGLYNN:  Objection.

4              THE WITNESS:  Could

5         transition or could ignite the

6         foam that's right there, well, I

7         haven't done any testing, no.

8    BY MR. VOTER:

9         Q.    Okay.  Well, once it leaves

10   the cabinet, it's not in contact with

11   foam anymore, correct?

12        A.    Correct.

13        Q.    So let me be clear again.

14   If the arc occurred in that two-inch

15   section outside the cabinet, have you

16   done any testing to determine whether an

17   arc location there could produce the fire

18   inside the cabinet?

19        A.    No.

20        Q.    Have you done any testing to

21   determine if an arc in the area of the

22   wiring harness that's encased in foam

23   could produce a fire inside the cabinet

24   that would be scientifically similar to

Christoph J. Flaherty, P.E.

1    the fire or to the damage inside the

2    refrigerator that you see now?

3              MR. McGLYNN:  Objection;

4         form, asked and answered.

5              THE WITNESS:  Well, that was

6         the challenge we faced in

7         considering any testing, which is

8         we did not have enough data to

9         create what could be argued to be

10        a scientifically similar

11        environment in order for the

12        testing to be potentially

13        meaningful.  So the short answer

14        to your question is no.  The long

15        answer is because it wouldn't have

16        been meaningful.

17   BY MR. VOTER:

18        Q.    What methodology did you use

19   in analyzing this fire?

20        A.    I used the fire

21   investigation -- the general fire

22   investigation techniques of 921, although

23   in my investigation of this fire it was

24   limited to analysis of potential

Christoph J. Flaherty, P.E.

1    electrical fire causes and specific to

2    potential fire cause, also potential fire

3    causes within the refrigerator itself.

4         Q.    You referred to 921.  Is

5    that NFPA 921?

6         A.    Yes.

7         Q.    Could you articulate the

8    steps in the NFPA 921 methodology?

9         A.    To gather data, form

10   hypotheses, test hypotheses, reanalyze

11   hypotheses.  It's my sort of memory,

12   meaning I'm doing those from memory right

13   now.

14        Q.    I have gather data, read

15   hypotheses, test hypotheses, reanalyze

16   hypotheses.  Anything else?

17        A.    The -- and in order to

18   arrive at a definitive cause, you would

19   select the final hypothesis and look at

20   alternate causes.

21        Q.    You said select final

22   hypothesis and then look at alternate

23   causes?

24        A.    Yes.  I would say that was a

Christoph J. Flaherty, P.E.

1    portion of -- a part of selecting our

2    final hypothesis would be to consider, to

3    reconsider ultimate causes that would

4    contraindicate your final hypothesis,

5    look for contraindications.

6         Q.    Okay.  I'm a little

7    confused.  Gather data, create

8    hypotheses, test hypotheses, reanalyze

9    hypotheses, and select final hypothesis,

10   and then if it's a final hypothesis, what

11   do you do with that?

12        A.    Well, then that would be the

13   cause.

14        Q.    Okay.

15        A.    If you're able to eliminate

16   your other hypotheses, your selection of

17   the final hypothesis would be the cause.

18        Q.    Okay.  What is a hypothesis?

19        A.    A hypothesis is a scientific

20   idea that you can test.

21        Q.    Have you ever been involved

22   in a case where you were unable to come

23   up with the cause of a fire?

24        A.    Yes.

Christoph J. Flaherty, P.E.

1          Q.     And is it fair to say that

2     if you can't get to, as you go through

3     the scientific method of 921, if you

4     can't get to a final hypothesis, then

5     you're unable to come up with the cause

6     of the fire, correct?

7                    MR. McGLYNN:   Objection.

8     BY MR. VOTER:

9          Q.     Okay.   You can answer.

10          A.     Short from the -- you're not

11    able to say what the definitive cause

12    was, yes, correct.

13          Q.     And am I correct that you

14    did not come up with a final hypothesis

15    for the cause of this fire?

16                    MR. McGLYNN:   Object.

17                    THE WITNESS:   That is

18          correct.   In this fire I did not

19          select a final hypothesis because

20          I have two -- I have competing

21          hypotheses, either of which could

22          have caused the fire.

23    BY MR. VOTER:

24          Q.     And am I correct that you

Christoph J. Flaherty, P.E.

1    made -- you performed no testing with

2    respect to either of the potential

3    hypotheses that you came up with in this

4    case, correct?

5              MR. McGLYNN:  Object.

6              THE WITNESS:  I determined

7         that testing that I might perform

8         would not be valuable in trying to

9         narrow it down.

10   BY MR. VOTER:

11             Q.    Well, let's be clear.  Did

12   you do any testing as to -- or did you do

13   any testing with regard to either of your

14   hypotheses?

15             A.    No.

16             Q.    Did you ever visit the fire

17   scene?

18             A.    No, I did not.

19             Q.    There is a reference in your

20   report to Fire Chief Givens.  Do you

21   recall who he is?

22             A.    Yes.

23             Q.    Do you know what his

24   qualifications are as a fire

Christoph J. Flaherty, P.E.

1    investigator, if any?

2         A.    No.

3         Q.    Can I assume from your

4    earlier answers that you did no testing

5    to determine whether an arc that occurs

6    within the area where the wiring harness

7    is surrounded by foam, that that could

8    create a fire that is sustained within

9    the refrigerator?

10              MR. McGLYNN:  Objection.

11              THE WITNESS:  That's

12         correct.

13   BY MR. VOTER:

14        Q.    Did you conduct any research

15   with respect to either of your

16   hypotheses?

17              MR. McGLYNN:  Objection.

18              THE WITNESS:  Yes.

19   BY MR. VOTER:

20        Q.    What research did you

21   perform?

22        A.    The research into the, what

23   we've been referring to as the light

24   overheating issue and its previous

Christoph J. Flaherty, P.E.

1    occurrences, damage that could be caused

2    by that.  And then other than that, it

3    would just be the basic -- I didn't

4    perform any additional research specific

5    to this case.  It would just be the

6    basics concerning electrical arc

7    generation, the response of electrical

8    systems to fires and the capability of

9    electrical ignition sources to ignite

10   fires.

11        Q.    Well, so the only research

12   that you did was review of the root cause

13   analysis that was conducted by LG Korea,

14   correct?

15        A.    In addition to just the

16   occurrence of -- additional occurrences

17   of reported light overheating failures.

18   Separate from their analysis, just the

19   reported incidents of that occurring.

20        Q.    Well, you've indicated

21   previously that those materials simply

22   gave you reason to --

23        A.    Consider it.

24        Q.    -- consider the light as a

Christoph J. Flaherty, P.E.

1   possible source of the fire, right?

2       A.    Correct.

3       Q.    Am I correct that you didn't

4   do any of your own research on that, but

5   you reviewed the work done by LG Korea,

6   correct?

7       A.    I guess I would qualify my

8   work as research.  Are you --

9       Q.    Well, let's not quibble over

10  the word "research."  The only technical

11  information that you reviewed was the

12  work that was done by LG Korea, correct?

13      A.    Specific to fire in that

14  refrigerator, yes.

15      Q.    Okay.  Well, and in this

16  case, right?

17          MR. McGLYNN:  Objection.

18          THE WITNESS:  Well, I mean

19          I've reviewed lots of technical

20          work concerning fire causes or

21          fire, interactions of fire and

22          electrical systems and electrical

23          fire causes in general.

24  BY MR. VOTER:

Christoph J. Flaherty, P.E.

1          Q.    Well, I'm certain of that.

2     I'm talking about any research relating

3     to the issues in this case.  The only

4     material you reviewed was what was done

5     by LG Korea, right?

6               MR. McGLYNN:  Well,

7          objection.  Objection.

8     BY MR. VOTER:

9          Q.    You can answer the question.

10         A.    In terms of technical

11    analysis of this particular refrigerator

12    model, the only material I've reviewed is

13    that produced by LG.

14         Q.    Okay.  And the analysis done

15    by LG showed that the light bulb, even

16    without thermal protection, the light

17    bulb doesn't get hot enough to ignite

18    material inside the refrigerator; am I

19    correct?

20              MR. McGLYNN:  Objection.

21              THE WITNESS:  LG showed that

22         it wouldn't ignite their

23         refrigerator materials, not that

24         it couldn't ignite materials

Christoph J. Flaherty, P.E.

1             inside the refrigerator.

2     BY MR. VOTER:

3             Q.    Well, how hot does it -- did

4     it get?

5                     MR. McGLYNN:  Objection.

6                     THE WITNESS:  Are you --

7                     MR. McGLYNN:  Hold on a

8             second.  Objection.  How hot could

9             it get where, and what are you

10            talking about?

11                    MR. VOTER:  In the test

12            result.

13                    MR. McGLYNN:  LG's test

14            results?

15                    MR. VOTER:  Yeah.

16    BY MR. VOTER:

17            Q.    Do you know?

18            A.    Yes.

19            Q.    What's the number?

20            A.    This goes back to my issue

21    with why we didn't do testing in the

22    particular, which is how hot it's going

23    to get depends on how it's -- how

24    everything in the refrigerator is

Christoph J. Flaherty, P.E.

1    arranged, what's in the refrigerator, how

2    close it is to the light.  All of those

3    factors are variables.  With an empty

4    refrigerator with nothing in it, I think

5    they measure temperatures in the 180

6    degree range.

7        Q.    And you didn't do any

8    testing or independent analysis to see if

9    some different temperature would be

10   reached under different conditions, is

11   that a fair statement?

12       A.    Based on the considerations

13   and reasons that I previously stated, I

14   did not do any testing.

15           MR. VOTER:  Okay.  That's

16           all the questions I have.  I may

17           have some questions if Mr. McGlynn

18           asks you questions, but either way

19           thank you for your patience.

20           THE WITNESS:  Yes, sir.

21                   - - -

22             EXAMINATION

23                   - - -

24   BY MR. McGLYNN:

Christoph J. Flaherty, P.E.

1      Q.    Okay.  Mr. Flaherty, were

2   you asked to evaluate the evidence in

3   this case in light of Mr. Buckley's

4   conclusion that the fire had started

5   within the top-third portion of this

6   Ellis refrigerator?

7      A.    Yes.

8      Q.    And was the evidence as you

9   evaluated it consistent with Mr.

10  Buckley's determination that the fire had

11  originated within the top-third portion

12  of the refrigerator?

13     A.    Yes.

14     Q.    And in fact, you had

15  identified at a lab exam an electrical

16  arc located within the top-third portion

17  of the subject refrigerator; is that

18  correct?

19     A.    Yes.

20     Q.    Okay.  Could that electrical

21  arc could have caused this fire?

22     A.    Yes.

23     Q.    Okay.  So I'm just going to

24  walk you through if you would, if you

Christoph J. Flaherty, P.E.

1    want to turn to your I think it's been

2    marked as Exhibit 1, the conclusions in

3    your report, and it's I believe Page 6.

4    No. 1 lists, "All potential electrical

5    failures external to the refrigerator in

6    the Ellis residence were eliminated as

7    possible fire causes.  Potential failures

8    considered included failures of the power

9    cords of either the refrigerator or

10   range, failure of the green extension

11   cord behind the range, failure of the

12   house branch circuit wiring or outlets,

13   failure of the range's electronics or

14   internal wiring."

15            Is that still your opinion

16   and do you hold that opinion within a

17   reasonable degree of engineering

18   certainty?

19            A.    Yes to both.

20            Q.    Okay.  And let's move to No.

21   2.  "The location of the electrical

22   arcing identified on the FD-HTR circuit

23   in the left forward quadrant of the top

24   to the refrigerator is consistent with a

Christoph J. Flaherty, P.E.

1    fire starting in the front of the top

2    part of the refrigerator."

3              Is that still your opinion

4    and do you hold that within a reasonable

5    degree of engineering certainty?

6         A.    Yes to both again.

7         Q.    Okay.  Conclusion No. 3,

8    which is, "The observed location of the

9    electrical failure in the top left

10   forward corner of the refrigerator

11   provides arc-mapping substantiation to

12   Mr. Buckley's elimination of the

13   stove-top as a potential area of fire

14   origin and his determination that a fire

15   originated in the top of the

16   refrigerator."

17             Okay.  Do you still hold

18   that opinion and do you hold that within

19   a reasonable degree of engineering

20   certainty?

21        A.    Yes, in both cases again.

22        Q.    Okay.  Can you explain to us

23   what you mean when you say -- well, first

24   of all, what is arc-mapping and why does

Christoph J. Flaherty, P.E.

1      that provide substantiation in this case

2      to Mr. Buckley's conclusion that the

3      stovetop was eliminated as a potential

4      area of fire origin?

5            A.    Arc-mapping describes the

6      process of using locations of identified

7      electrical arcing to aid in determining

8      the fire spread, and in many cases it can

9      be used to help identify a fire area of

10     origin or to serve as an additional

11     method to substantiate or support an area

12     of origin determined through other means.

13            Arc-mapping is based on the

14     principle that an energized electrical

15     circuit attacked by fire will tend to

16     short-circuit and cause arcing which

17     results in melting of conductors that can

18     be physically observed after the fire.

19            And then where those

20     instances occur and form the fire spread,

21     in this particular instance the wiring

22     harness had an electrical arc at the top

23     left forward quadrant of the

24     refrigerator.  That harness transited

Christoph J. Flaherty, P.E.

1   from the control panel which was at the

2   back right, probably about halfway up the

3   refrigerator as we diagramed.

4           And Mr. Buckley and I

5   discussed this specifically regarding a

6   stovetop fire.  If a stovetop fire had

7   attacked the refrigerator from the side,

8   would we expect the refrigerator

9   materials to burn sufficiently to damage

10  the wiring harness in that area before

11  damaging the wiring harness in the top

12  left corner of the refrigerator.

13          I asked him, you know, in

14  order for the fire to have started on the

15  stovetop and to cause the arcing in the

16  vicinity of the left top, in the left

17  forward top quadrant, the fire would have

18  to have burned up from the stovetop

19  across the top of the refrigerator and

20  then down to the area of that hinge prior

21  to compromising the harness in any other

22  area before that, and he categorically

23  ruled out that possibility based on the

24  fire spreading patterns that he analyzed.

Christoph J. Flaherty, P.E.

1          Q.    Okay.  So let me just go ask

2    you a couple follow-up questions to what

3    you just said.  Hold on, bear with me

4    because I just lost my place.

5               So, in other words, you

6    believe that you wouldn't have that

7    electrical arcing which means that that

8    location, that front forward left portion

9    were energized had the fire been started

10   on the stovetop.  Is that what you just

11   said?

12               MR. VOTER:  Object to the

13        form.

14               THE WITNESS:  The -- that

15        was --

16   BY MR. McGLYNN:

17          Q.    I guess what I want to know

18   is, how do you explain I guess in

19   layman's terms what you mean when you say

20   that the electrical arc-mapping

21   substantiates Buckley's elimination?

22               I know that you told us Mr.

23   Buckley conclusively eliminated a

24   stovetop fire.  Why does this electrical

Christoph J. Flaherty, P.E.

1  arc support that elimination?  I'm just

2  asking you to finish your thought that

3  you started a moment ago.

4      A.   Because the electrical arc

5  occurring in this close to the end of the

6  wiring harness concentrates the first and

7  most intense fire attack to that wiring

8  harness in that area.  The -- that

9  substantiates his determination because

10  had the fire started on the stovetop, it

11  should have attacked it closer to the

12  control box.

13      Q.   Okay.  So I guess what I'm

14  asking is on one hand it supports Mr.

15  Buckley's conclusion that the fire

16  started within that top-third quadrant;

17  is that correct?

18      A.   Yes.

19      Q.   Okay.  And on the other hand

20  it supports Mr. Buckley's elimination of

21  the stovetop as a potential cause of the

22  fire; is that correct?

23      A.    Yes.  I wouldn't say that

24  it's sufficient in and of itself to

Christoph J. Flaherty, P.E.

 1    eliminate the stovetop fire, but as I

 2    said in my report, it substantiates it.

 3         Q.    Yeah.  Well, and you're not

 4    even being asked to determine whether a

 5    stovetop fire happened here or not; is

 6    that right?

 7         A.    Yes.

 8         Q.    Okay.  So that's simply all

 9    I'm asking you, whether or not that

10    specific piece of evidence supports Mr.

11    Buckley's determination.

12              MR. VOTER:  Object to the

13         form.

14              THE WITNESS:  Yes.

15    BY MR. McGLYNN:

16         Q.    Okay.  And in support of

17    your evaluation and conclusion that the

18    evidence in this case supports Mr.

19    Buckley's determination, can you tell me

20    whether or not you reviewed Mr. Ferrese's

21    photographs from the scene and an

22    evidence exam?

23         A.    Yes, I did review Mr.

24    Ferrese's photos.

Christoph J. Flaherty, P.E.

1          Q.     Did you review Mr. Buckley's

2     photographs from the scene and multiple

3     scene exams and the evidence exam?

4          A.     I don't recall seeing Mr.

5     Buckley's photos.

6          Q.     Okay.  Did you ever see

7     other photographs from a scene exam that

8     would have been incorporated in any of

9     your materials?

10         A.     Just Mr. Ferrese's

11    photographs.

12         Q.     All right.  Well, I mean,

13    obviously I'm assuming you saw Mr.

14    Buckley's report, right?

15         A.     Yes.

16         Q.     And in looking at his report

17    you saw his photographs taken from the

18    first and second site exams, correct?

19         A.     So I would have seen any

20    photographs in Mr. Buckley's report.

21         Q.     Okay.  I also want to ask

22    you, you then conducted your -- Ferrese,

23    Mr. Ferrese or Dr. Ferrese did his own

24    evidence exam, is that correct, and took

Christoph J. Flaherty, P.E.

1      pictures of that?

2              A.      Yes.

3              Q.      Okay.   And on top of that,

4      you yourself did an evidence exam of the

5      evidence retained in this case, correct?

6              A.      Yes.

7              Q.      Did you trace out the wiring

8      to the wiring harness?

9              A.      At the time doing my

10     evidence exam, I traced out the wiring

11     portion of that since it had been removed

12     previously by Mr. Ferrese.   Fortunately

13     it had been done in a very careful and

14     well-documented fashion in that each

15     individual conductor was tagged before it

16     was cut, so we were able to trace out the

17     wire all the way back to the connector on

18     the control board.

19             Q.      Okay.   So I guess my

20     question is, not only did you have the

21     benefit of those Dr. Ferrese pictures,

22     but you yourself actually put your own

23     eyes on the evidence and traced out the

24     wiring as well, correct?

Christoph J. Flaherty, P.E.

1          A.     Yes.

2          Q.     Okay.  You also had an

3     opportunity to examine the stovetop

4     range, correct?

5          A.     Yes.

6          Q.     Okay.  And I understand in

7     reviewing the pictures that you took from

8     that evidence exam that you looked at the

9     wiring behind the control panel portion

10    of the GE stove; is that correct?

11         A.     Yes.

12         Q.     All right.  Now, you also --

13    I think that was your second.  I'm sorry,

14    that was the first conclusion from your

15    report that you were able to eliminate

16    the range, but I guess I want to ask you

17    how you can eliminate the range as a

18    potential cause for the fire.  And then

19    the second question is, you know, if the

20    fire had started on the range, would you

21    expect to see electrical activity in the

22    area of the control panel where the

23    wiring for that control panel is located?

24              MR. VOTER:  Objection.

Christoph J. Flaherty, P.E.

```
1              That's obviously a compound
2              question and it goes beyond the
3              scope of this witness's expertise.
4                   MR. McGLYNN:  No, I
5              certainly beg to differ, but I
6              will ask it in a non-compound way.
7    BY MR. McGLYNN:
8         Q.    How can you eliminate the
9    range as a cause of the fire?
10                  MR. VOTER:  Objection; form
11             and foundation.
12                  MR. McGLYNN:  Sorry, you're
13             right.
14   BY MR. McGLYNN:
15        Q.    How can you eliminate the
16   electrical components of the range as a
17   cause of the fire?
18                  MR. VOTER:  Thank you.
19                  THE WITNESS:  I was about to
20             make that clarification myself.
21             The electrical components did not
22             indicate any evidence of
23             electrical damage.  They indicated
24             evidence that was consistent with
```

Christoph J. Flaherty, P.E.

1               fire attack.  There was also no
2               electrical arcing identified.  At
3               the time that the circuitry on the
4               range was burned, it was no longer
5               energized.
6      BY MR. McGLYNN:
7               Q.    Okay.  So if the fire had
8      started on the stovetop and the control
9      panel or range was energized, would you
10     have expected to see electrical activity
11     or arcing on the wiring that you
12     examined?
13              MR. VOTER:  Object to the
14              form.
15              THE WITNESS:  Yes, normally
16              I would expect that.
17     BY MR. McGLYNN:
18              Q.    Okay.  I want to direct you
19     to your Conclusion No. 4.  "The observed
20     electrical arcing on the FD-HTR circuit
21     wire was either caused by fire attack or
22     by mechanical damage to the insulation of
23     the conductor."
24              Is that still your opinion

Christoph J. Flaherty, P.E.

1    within a reasonable degree of scientific

2    certainty?

3            A.    Yes.

4            Q.    Okay.  And does the second

5    one -- I apologize.  I'm just having a

6    hard time getting these out of the way.

7                  The second line which is,

8    "No additional evidence was available

9    which would allow a determination that

10   either fire attack or mechanical damage

11   was the more likely cause of the

12   electrical failure in the FD-HTR

13   circuit," is that still your opinion

14   within a reasonable degree of scientific

15   certainty?

16           A.    Yes.

17           Q.    Okay.  Now, Mr. Voter had

18   asked you questions about whether or not

19   their having a specific larger relay you

20   saw as well as the thermal protection

21   employed with this light bulb assembly.

22   Do you recall being asked a lot of

23   questions about those two items?

24           A.    Yes.

Christoph J. Flaherty, P.E.

1          Q.     Does the addition of a

2    thermal protector or the larger relay

3    cause you to eliminate the light bulb

4    assembly as a potential source of

5    ignition?

6          A.     No, not completely.

7          Q.     Okay.  And can you

8    explain -- well, first of all, let me ask

9    you in your report, you did not -- you do

10   not contend that the -- it does not seem

11   to me like your opinion is that the relay

12   was defective, or do you have an opinion

13   on whether or not the particular relay

14   installed at the time of the fire was or

15   wasn't effective?

16          MR. VOTER:  Effective or

17        defective?

18          MR. McGLYNN:  I said

19        effective.

20          MR. VOTER:  I object to the

21        question.  Can I hear it again?

22          (Court reporter read back

23        the preceding question.)

24          MR. McGLYNN:  So let me

Christoph J. Flaherty, P.E.

1           rephrase that.

2    BY MR. McGLYNN:

3           Q.    Okay.  Do you have an

4    opinion about whether or not the relay

5    that was installed that we've been

6    discussing at the time of the fire was

7    effective or not?

8                 MR. VOTER:  Object to the

9           form.

10                THE WITNESS:  No.

11   BY MR. McGLYNN:

12          Q.    Okay.  Had the relay been

13   properly designed and installed, would

14   that cause you to eliminate the light

15   bulb assembly as a potential cause of

16   this fire?

17          A.    No.  I think you mentioned

18   other possibilities were how the light

19   might be illuminated without a defective

20   relay.

21          Q.    Right.  And I'm going to ask

22   you about that in a second, but the same

23   question goes for the thermal protection.

24   Does the fact that a thermal protection

Christoph J. Flaherty, P.E.

1       device existed or was found or recovered

2       among the evidence cause you to eliminate

3       that light bulb assembly as a potential

4       source of ignition in the top-third

5       compartment of the refrigerator?

6               A.      No.

7               Q.      Okay.  And can you explain

8       why you cannot eliminate -- I mean, at

9       the risk of being redundant, why you

10      can't eliminate that light bulb assembly?

11                      MR. VOTER:  At the risk of

12              being what, Joe?

13                      MR. McGLYNN:  Redundant.

14                      THE WITNESS:  Well, we see

15              appliances with thermal protectors

16              cause fires with more regularity

17              than we would like.  So I think in

18              my earlier answers to Mr. Voter's

19              questions, I often prefaced with

20              properly selected, properly

21              installed and not degraded

22              performance of any kind, which are

23              things that we can't rule out in

24              this instance.

Christoph J. Flaherty, P.E.

1    BY MR. McGLYNN:

2         Q.    Okay.  And just one example

3    may be thousands of Broan-NuTone fans

4    that were the subject of a recall.  Have

5    you ever worked or examined any of those

6    Broan-NuTone fans?

7              MR. VOTER:  Objection; form,

8         foundation, relevance.

9              THE WITNESS:  I don't think

10        there has been any recall, but I

11        have looked at numerous bathroom

12        ventilation fans with thermal

13        protectors installed that have

14        failed and caused fires.

15   BY MR. McGLYNN:

16        Q.    Okay.  Have you ever seen

17   other appliances which have had a thermal

18   protection device that's failed and

19   caused a fire?

20        A.    Yes.

21        Q.    I should say an appliance

22   that caused a fire which nevertheless had

23   a thermal protection device installed in

24   it.

Christoph J. Flaherty, P.E.

```
 1                  MR. VOTER:  Object to the
 2           form and foundation.
 3                  THE WITNESS:  Yes.
 4    BY MR. McGLYNN:
 5           Q.    Okay.  Is it fair to say
 6    that most electrically powered products
 7    on the market today have thermal
 8    protection devices of some kind?
 9                  MR. VOTER:  Objection.
10                  THE WITNESS:  I'm not sure
11           if I would say most.  I guess that
12           kind of depends on -- yeah, the
13           question is a little bit too
14           broad.  It kind of depends on what
15           we talked about, electrical
16           products, what levels of thermal
17           protection.  Yeah, in the broader
18           sense, most, most electrical
19           products have some form of thermal
20           protection.
21    BY MR. McGLYNN:
22           Q.    Are you asking me a question
23    now, C.J.?
24           A.    No.  I was just trying to
```

Christoph J. Flaherty, P.E.

1    think about the way that you had phrased

2    it.  Yeah, I think that's accurate.

3          Q.    That most electrically

4    powered products have a thermal

5    protection device installed?

6          A.    Have some form of thermal

7    protection.  I wouldn't necessarily

8    say -- you know, it depends on the type

9    of product, regarding the type of device

10   and all of those things, but yes.

11         Q.    Okay.  And I guess my next

12   question which you've already anticipated

13   was what causes you to be unable to --

14   why can't you eliminate the whole

15   assembly as a potential source of

16   ignition here?

17              MR. VOTER:  Objection; asked

18         and answered.

19              THE WITNESS:  Because of its

20         location and its capacity to

21         generate heat in that area and

22         because of the determination of

23         the fire origin in the area of the

24         top of the refrigerator.

Christoph J. Flaherty, P.E.

1    BY MR. McGLYNN:

2            Q.    Okay.   Your Conclusion No. 5

3    is, "Potential fire causes within the

4    area of fire origin inside the top of the

5    Ellis refrigerator are limited to failure

6    of the FD-HTR heater circuit insulation

7    due to mechanical damage sustained over

8    years of use or ignition of combustible

9    food storage containers close to, or in

10   contact with, the internal light fixture.

11   In either case, the fire was caused by a

12   defect within the refrigerator."

13           Do you still hold that

14   opinion within a reasonable degree of

15   engineering certainty?

16           A.    Yes.

17           Q.    Were you able to -- have

18   you -- in evaluating the evidence in this

19   case, have you evaluated -- have you

20   observed or identified any other

21   electrical sources, competent sources of

22   ignition that you weren't otherwise able

23   to eliminate as the cause of the fire?

24           A.    No.

Christoph J. Flaherty, P.E.

1        Q.    Does -- I'm going to ask you

2   the same question for any of these five

3   questions.  For any of these five

4   conclusions -- I'm sorry.

5             Does the effectiveness of

6   the larger relay or thermal protection

7   device that was photographed by Mr.

8   Nemeth or Nemeth impact or cause you to

9   alter any of these five conclusions?

10        A.    No.

11             MR. McGLYNN:  I don't have

12        any other questions.  Mr.

13        Flaherty, thank you.

14                    - - -

15                  EXAMINATION

16                    - - -

17   BY MR. VOTER:

18        Q.    Mr. Flaherty, am I correct

19   that your role was to assess potential

20   electrical causes of the fire?

21        A.    Yes.  I would qualify my

22   role as assess potential electrical

23   causes of the fire and opine as to which

24   potential fire causes are in the area of

Christoph J. Flaherty, P.E.

1    determined fire origin in the top portion

2    of the refrigerator.

3         Q.    Okay.  That's something you

4    understood at the time of the evidence

5    exam?

6         A.    The aspect of analyze the

7    potential electrical fire causes was

8    certainly understood at the time, yes.

9    Yes.

10        Q.    Okay.  It was not your role

11   to assess nonelectrical causes of the

12   fire, correct?

13        A.    Correct.

14        Q.    I'm curious about your

15   testimony just now in response to Mr.

16   McGlynn's questions about the light bulb.

17   You said if the relay and the thermal

18   protector were properly selected,

19   properly installed -- excuse me.  We were

20   talking only about the thermal protector.

21             You said if the thermal

22   protector was properly selected, properly

23   installed and not degraded, then it would

24   have prevented this fire, correct?

Christoph J. Flaherty, P.E.

1          A.     Yes.

2          Q.     And you have no

3     information --

4          A.     I'm sorry.  I need to modify

5     that answer.  It would have prevented a

6     fire starting as a result of the bulb

7     overheating.

8          Q.     Fair enough.  You have no

9     information about whether its selection

10    was proper, correct?

11         A.     Correct.

12         Q.     You made no effort to find

13    out whether its selection was proper,

14    correct?

15              MR. McGLYNN:  Well,

16         objection.

17    BY MR. VOTER:

18         Q.     Okay.  You can answer the

19    question.

20         A.     I wasn't -- I made an

21    effort, but I wasn't able to determine

22    whether its selection was proper.

23         Q.     What effort did you make?

24         A.     To see what the expected

Christoph J. Flaherty, P.E.

1    temperatures were and to see what its

2    setpoint was.

3         Q.    What did you do to try to

4    determine that?

5         A.    I reviewed the LG

6    documentation.

7         Q.    Oh, was the information in

8    there?

9         A.    I saw the temperature

10   testing was in there, and I don't recall

11   the setpoint temperature, if it was in

12   there for the thermal protector.

13        Q.    Did you ask Mr. McGlynn to

14   find out?

15        A.    No.

16        Q.    And since they were testing

17   refrigerators that didn't have thermal

18   protection, are you surprised that there

19   wasn't information about the thermal

20   protector in there?

21             MR. McGLYNN:  Objection.

22             THE WITNESS:  No.

23   BY MR. VOTER:

24        Q.    Do you have any information

Christoph J. Flaherty, P.E.

1    that the thermal protector in the Ellis's

2    refrigerator was improperly installed?

3         A.    No.

4         Q.    Do you have any information

5    that the thermal protector installed in

6    the Ellis's refrigerator was degraded to

7    the point that it was not effective?

8         A.    No.

9         MR. McGLYNN:  Object.

10   BY MR. VOTER:

11        Q.    Your Conclusion 5 says,

12   "Potential fire causes within the area of

13   fire origin inside the top of the Ellis

14   refrigerator are limited to failure of

15   the FD-HTR heater circuit insulation due

16   to mechanical damage sustained over years

17   of use."  Do you recall saying that?

18        A.    Yes.

19        Q.    Does your report anywhere

20   say that it could have been because of

21   damage done to the harness during

22   installation?

23        MR. McGLYNN:  Objection.

24        THE WITNESS:  I don't think

Christoph J. Flaherty, P.E.

1          so.
2    BY MR. VOTER:
3          Q.     So the only mention of a
4    mechanism of damage to the wiring harness
5    is mechanical damage sustained over years
6    of use --
7                MR. McGLYNN:  Objection.
8                MR. VOTER:  I didn't finish
9          my question.
10   BY MR. VOTER:
11         Q.     Have you done any research
12   or made any effort to determine how a
13   refrigerator of this design could have
14   resulted in mechanical damage to the
15   wiring harness over years of use?
16               MR. McGLYNN:  Objection.
17               THE WITNESS:  Not separate
18         from reviewing the designs.
19   BY MR. VOTER:
20         Q.     Which don't tell you how it
21   could have produced mechanical damage to
22   the wire harness, correct?
23               MR. McGLYNN:  Object.
24               THE WITNESS:  They indicate

Christoph J. Flaherty, P.E.

1          the potential for mechanical

2          damage based on the location of

3          the transition and the motion of

4          the hinge, but there is no

5          specific indication that it would

6          be.

7     BY MR. VOTER:

8          Q.    And you never looked at an

9     exemplar to see whether there in fact

10    would be that problem, correct?

11              MR. McGLYNN:  Objection.

12              THE WITNESS:  That's right.

13              MR. VOTER:  Okay.  That's

14          all I have.  Thank you.

15              MR. McGLYNN:  All right.  I

16          just have a couple follow-ups, Mr.

17          Flaherty.

18                  -  -  -

19              EXAMINATION

20                  -  -  -

21    BY MR. McGLYNN:

22          Q.    Have you seen any LG

23    documents which would suggest that the

24    selection and installation of the wiring

Christoph J. Flaherty, P.E.

1    harness was appropriate for this

2    particular refrigerator?

3              MR. VOTER:  Objection to

4         form.

5              THE WITNESS:  I'm sorry.

6         Could you say that again?  The

7         selection and installation of the

8         wiring harness?

9    BY MR. McGLYNN:

10         Q.    Right.  Do you understand

11   the question that I just asked?

12         A.    I don't think I do.

13         Q.    Okay.  All right.  I thought

14   I heard you say in answering Mr. Voter's

15   question that there is a few ways that

16   the wiring could fail; is that right?

17   Not the thermal protection and the wiring

18   harness.  I'm just asking you about the

19   wiring harness now.

20              MR. VOTER:  Is there a

21         question?

22              THE WITNESS:  So are we

23         talking about a specific --

24              MR. McGLYNN:  Thanks,

Christoph J. Flaherty, P.E.

1                Warren.  If you have an objection,

2                raise it.  Okay?

3                     MR. VOTER:  I'm waiting for

4                a question to make the objection,

5                but I didn't hear one.

6                     MR. McGLYNN:  Okay.

7      BY MR. McGLYNN:

8                Q.   Have you received any

9      documents from LG which suggest that the

10     selection and installation and the

11     routing of the wiring harness for this

12     refrigerator was appropriate?

13                    MR. VOTER:  Object to the

14                form.

15                    THE WITNESS:  I see nothing

16                in the design documents to

17                indicate that it is inappropriate.

18     BY MR. McGLYNN:

19                Q.   I didn't ask you that

20     question.  I don't care about the design

21     documents.  I want to know about all the

22     documents that you got in discovery in

23     this case.  Did LG show you that the

24     routing, installation and selection of

Christoph J. Flaherty, P.E.

1    the wiring harness was appropriate?  Did

2    they test it for this one?  Have you seen

3    records showing that it was tested, that

4    there was some post-manufacture

5    inspection that was done?  Do you know

6    whether someone actually saw how this

7    thing was installed or routed?  Have you

8    seen any of those documents?

9                    MR. VOTER:  Objection;

10        compound question.

11                    THE WITNESS:  No.

12    BY MR. McGLYNN:

13        Q.    Do you know whether or not

14    the plaintiff asked for those documents?

15        A.    No.

16        Q.    Can you tell me if the same

17    questions would apply to the thermal

18    protection device for this particular

19    light bulb assembly?  Have you seen any

20    documents whatsoever from LG that show

21    that this thing, that the light bulb

22    assembly thermal protection device was

23    inspected, tested, looked at by anyone

24    after it was placed in this refrigerator?

Christoph J. Flaherty, P.E.

1          A.    No.

2          Q.    Do you know whether or not

3     the plaintiff had to ask for that?

4          A.    No.

5          MR. McGLYNN:  I don't have

6          any other questions.

7                    - - -

8               EXAMINATION

9                    - - -

10    BY MR. VOTER:

11         Q.    Mr. Flaherty, did you review

12    the UL documents on this product?

13         A.    Yes.

14         Q.    And isn't the wiring and

15    electrical systems of the refrigerator

16    addressed in those documents and in the

17    standard?

18         MR. McGLYNN:  Objection.

19         THE WITNESS:  The UL

20         documents are generic I guess I

21         would qualify them as.  UL

22         typically tests or examines an

23         exemplar of a product line and

24         then covers the whole host of

Christoph J. Flaherty, P.E.

1              available models under the same
2              examination or investigation.  So
3              I do not have any high degree of
4              certainty that the specific UL
5              testings or examinations apply to
6              this specific refrigerator.
7    BY MR. VOTER:
8              Q.    Well, you don't know either
9    way?
10             A.    Yeah.
11             Q.    You didn't even review the
12   whole thing, correct?
13             MR. McGLYNN:  Objection.
14   BY MR. VOTER:
15             Q.    Correct?
16             A.    Correct.
17             MR. VOTER:  Okay.  I have no
18             other questions.
19             MR. McGLYNN:  Okay.
20             MR. VOTER:  All right.
21             (Witness excused.)
22             (Deposition concluded at
23             3:08 p.m.)
24

Christoph J. Flaherty, P.E.

CERTIFICATION

I, JARED E. BITTNER RPR and NJ CSR License No. 30XI00235600, do hereby certify that prior to the commencement of the examination, CHRISTOPH J. FLAHERTY, P.E., was duly remotely sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

JARED E. BITTNER, RPR
NJ CSR No. 30XI00235600
Notary Public
Dated: January 7, 2021

# Flaherty Engineering Investigation Report

*By Christoph J. Flaherty, PE*        *November 6, 2020*

**Subject:** Ellis Residence Fire
        DOL: March 10, 2019
        Flaherty Engineering Case 1505

## 1. Assignment

On January 24, 2020, I was asked to assist in investigating the fire which occurred on March 10, 2019 at the Ellis residence located at 54 Love Lane in Norwood, Pennsylvania. The purpose of the investigation was to assist and provide electrical engineering expertise to the fire origin and cause investigation being conducted by Mr. Robert Buckley of Robert Buckley Fire & Explosion Investigations.

## 2. Background

On March 10, 2019, a fire occurred in the kitchen of the Ellis residence at approximately 7 p.m. while the family was out. After the Norwood Fire Company extinguished the fire, Fire Chief Chris Givens conducted an investigation and determined that the fire originated inside the Ellis's refrigerator. Mr. Buckley and Mr. Frank Ferrese, PhD, PE of FJT Technologies, LLC conducted a scene inspection during which evidence was removed and retained as well as a destructive laboratory evidence examination prior to Flaherty Engineering's involvement. See Mr. Buckley's report under separate cover for a summary of his investigation and findings.

## 3. Investigation

The Flaherty Engineering investigation has included, but is not limited to:

1. Review of scene and evidence photographs taken by Mr. Frank Ferrese.

2. Review of the report of Mr. Robert Buckley dated November 2, 2020.

3. Examination of retained evidence on February 5, 2020.

4. Review of Ellis refrigerator documentation.

5. Review of documents associated with a light overheating issue in the subject refrigerator.

6. Review of the following deposition transcripts:

    a. Mr. Thomas Ellis, taken on February 27, 2020;

    b. Ms. Lisa Ellis, taken on February 27, 2020; and

    c. Fire Chief Chris Givens, taken on March 6, 2020.



**EXHIBIT**
Flaherty-1
01/07/21    JEB

Additional discovery material may be produced and made available for analysis. Opinions expressed in this report may be amended and/or modified based on information revealed in any additional material produced.

### 3.1 Review of Ferrese Scene and Evidence Exam Photographs

Flaherty Engineering was provided with a 591-page pdf document consisting of copies of Dr. Ferrese's scene photographs and a 559-page pdf document consisting of copies of Dr. Ferrese's evidence exam photographs. Copies of photographs referred to in this report are included in Appendix A. Dr. Ferrese's scene photographs documented the location of the appliances and burn patterns in the kitchen, the status of the electrical distribution panel, and the removal of evidence. As the refrigerator was removed, the refrigerator power cord and the power cord for the gas range next to the refrigerator were depicted plugged into an undamaged duplex outlet behind the refrigerator (Photographs 1 & 2). As the range was removed, a green extension cord was depicted plugged into another undamaged duplex outlet located behind the range (Photograph 3). No cords were depicted plugged into the receptacle end of the extension cord. In the photographs depicting the removal of the refrigerator and the range, no fire damage was evident at or around the duplex outlets or on the power cords for the refrigerator or range. All branch circuit wiring depicted in the Ferrese scene photographs appeared intact.

In addition to fire damage around the refrigerator, the Ferrese scene photographs depicted severe fire damage to the top of the interior of the refrigerator. Portions of a wiring harness were visible extending from the back right rear corner near the top of the refrigerator across the interior back and top of the refrigerator to the left front corner of the top of the refrigerator (Photographs 4 & 5). The metal portions of the interior light housing were also visible in the photographs.

Dr. Ferrese's evidence exam photographs depicted the inspection of the refrigerator and the removal of the wiring harness. These photographs more clearly documented the location and routing of the wiring harness prior to its removal (Photographs 6-8). After the removal of the wiring harness, Dr. Ferrese's photographs depicted arcing on some of its conductors (Photographs 9-11).

Dr. Ferrese's photographs also documented the condition of the range and its wiring. The range's control display and wiring were fire-damaged with the most severe damage occurring on the left side of the range (the side adjacent to the refrigerator) and damage becoming progressively less severe towards the right side (Photographs 12-15). No evidence

of electrical arcing or other electrical failure separate from damage caused by fire attack was noted. The range power cord appeared to be undamaged.

### 3.2 Report of Mr. Robert Buckley

Mr. Robert Buckley of Robert Buckley Fire & Explosion Investigations conducted a fire origin and cause investigation and issued a report summarizing his investigation and findings on November 2, 2020. In his report, Mr. Buckley documented interviews he conducted with Mr. and Mrs. Ellis during which they reported that they did not use either of the two ranges in the kitchen on the day of the fire and that the range located next to the refrigerator was only used for special occasions requiring extra cooking capacity. The last use of the range next to the refrigerator was over two months before the fire.

In his report, Mr. Buckley summarized his use of primarily fire pattern and fire dynamics analysis to determine that the fire originated inside the refrigerator. Mr. Buckley specifically ruled out fire origins on the stove or at the rear of the stove or refrigerator. See Mr. Buckley's report for more detailed discussion regarding fire origin determination.

### 3.3 Evidence Examination

An examination of the retained evidence was conducted on February 5, 2020 at Evidence Management Center's facility in Wilmington, Delaware. Observations noted from Dr. Ferrese's photographs above were confirmed, namely that damage to the range wiring decreased in severity from the left to the right (Photographs 16 & 17), most damage occurred in the top of the refrigerator interior (Photographs 18 & 19), and that there was electrical arcing on the internal wiring recovered from the top of the refrigerator (Photographs 20-23). The arced conductors were traced and determined to be: a brown-insulated conductor (tagged with number 18) which came from a connector attached to the main control board with the corresponding pin marked "FD-HTR" (Photographs 24 & 25); and a blue-insulated conductor (tagged number 17) which could not be traced back to a specific connector but which corresponded to the color generally used for neutral conductors in this refrigerator (Photograph 26). Based on the location of the arcing on the wires and the routing of the wiring harnesses in which the conductors were run, the electrical failure occurred in the left forward quadrant of the top of the refrigerator, near the left door hinge (Photographs 27 & 28).

The power cords of both the refrigerator and range, as well as the green extension cord recovered from behind the range, were inspected. The power cords were undamaged by the fire. The green extension cord which, although plugged in, appeared to be unused, had a section

of approximately 6 inches where the insulation was burned away, but no evidence of electrical activity was found.

### 3.4 Ellis Refrigerator Documentation

The receipt for the subject refrigerator identified it as a Kenmore-branded model 79577562600 with serial number 707KR00296 which was purchased on February 15, 2008. Based on the serial number, the refrigerator was manufactured in Korea in July of 2007. The refrigerator Use & Care Guide and Service Manual were reviewed and revealed that in the area of the identified electrical failure the refrigerator had a water filter, the internal light fixture, and the wiring harness transition from inside the refrigerator to the upper left door hinge for supply to components in the left door. The Service Manual showed that the refrigerator was supplied with one type of main printed circuit board (PCB) through July, 2007 (designated 6871JB1431) and a second type of main PCB from August, 2007 (designated EBR34917102). On both versions of the circuit board, the connector for the wiring harness containing the arced, brown-insulated wire was designated "CON2". A wiring diagram in the Service Manual showed that the brown-insulated conductor from CON2 supplied the "FRONT HEATER", the "R-DOOR HEATER", and the "L-DOOR HEATER". The wiring diagram also showed that blue-insulated conductors are normally used to serve the neutral conductor function, providing the electrical return path to complete the associated circuits.

### 3.5 LG Light Overheating Issue

Confidential documents provided by LG summarized their testing and analysis of an identified light overheating issue in this model of refrigerator and others manufactured starting in 2006. During their investigation, LG determined that the relay controlling the interior refrigerator light could stick shut, thus causing the light to remain on for an extended time, even with the doors shut. LG conducted testing which showed that the plastic components of the light fixture could overheat and melt in these circumstances. The LG testing did not result in the ignition of fires, but they neglected to test with combustible food storage containers placed near the light, as would be expected during normal use.

LG implemented a number of corrective measures to prevent the overheating issue, first changing the lens cover material and the light housing material before adding thermal protection and finally changing the light control relay to a larger model that would be less susceptible to sticking. The Ellis's refrigerator was manufactured without thermal protection and with the original relay. On February 1, 2009, LG issued Service Flash SF46-520R2 which

had technicians replace the older main PCB (with the smaller light control relay) with a newer version which included the larger relay. The Service Flash did not install thermal protection. Records of Service Repair Orders conducted on the Ellis's refrigerator included a line-item for the completion of SF46-520 on February 28, 2009.

## 4. Discussion

All potential electrical failures external to the refrigerator were eliminated as possible fire causes. Potential failures considered included failures of the power cords of either the refrigerator or range, failure of the green extension cord behind the range, failure of the house branch circuit wiring or outlets, and failure of the range's electronics or internal wiring. In the case of the power cords and the house wiring and outlets their elimination was based on the lack of damage to them. In the case of the green extension cord and the range wiring and electronics, their elimination was based on them showing evidence of fire damage consistent with their location without evidence of electrical failure.

The location of the electrical arcing identified on the FD-HTR circuit in the left forward quadrant of the top to the refrigerator in the area of the top left door hinge (Photographs 27 & 28) is consistent with a fire starting in the front of the top part of the refrigerator. If a fire had started in the back or towards the right side of the refrigerator, the wiring harness should have first been compromised and failed closer to those areas based on how it was routed (Photograph 29). The observed location of the electrical failure in the top left forward corner of the refrigerator provides arc-mapping substantiation of Mr. Buckley's elimination of the stove-top as a potential area of fire origin and his determination that the fire originated in the top of the refrigerator. The observed electrical arcing on the FD-HTR circuit wire was either caused by fire attack or by mechanical damage to the insulation of the conductor.

The fire starting at the top front of the refrigerator as a result of combustible food storage items coming into contact with an overheating light fixture explains the observed arcing and fire patterns. Although review of the service records and the configuration of the main PCB of the Ellis's refrigerator confirm that the corrective Service Flash had been performed on it, the potential of a fire starting as the result of the light remaining 'on' for an extended time with combustible food storage containers in contact with it cannot be discounted since the Ellis refrigerator lacked the thermal protection which would have de-energized an overheating light.

Potential fire causes within the area of fire origin inside the top of the Ellis refrigerator are limited to failure of the FD-HTR heater circuit insulation due to mechanical damage

sustained over years of use or ignition of combustible food storage containers close to, or in contact with, the internal light fixture. In either case, the fire was caused by a defect within the refrigerator which led to the insulation damage or to the light becoming hot enough to ignite adjacent combustible material. Abnormal use or abuse of the refrigerator were eliminated as contributing to the possible fire causes since there was no evidence observed which indicated the potential for abnormal use or abuse. Since the wiring harness is not accessible to the customer and should have been sufficiently well-protected from mechanical damage if it had been designed and manufactured properly, any mechanical damage it sustained was due to a defect in the refrigerator at the time of manufacture.

## 5. Conclusions

Based on my investigation, I have concluded, to a reasonable degree of engineering certainty, that:

1. All potential electrical failures external to the refrigerator in the Ellis residence were eliminated as possible fire causes. Potential failures considered included failures of the power cords of either the refrigerator or range, failure of the green extension cord behind the range, failure of the house branch circuit wiring or outlets, and failure of the range's electronics or internal wiring.

2. The location of the electrical arcing identified on the FD-HTR circuit in the left forward quadrant of the top to the refrigerator is consistent with a fire starting in the front of the top part of the refrigerator.

3. The observed location of the electrical failure in the top left forward corner of the refrigerator provides arc-mapping substantiation to Mr. Buckley's elimination of the stove-top as a potential area of fire origin and his determination that the fire originated in the top of the refrigerator.

4. The observed electrical arcing on the FD-HTR circuit wire was either caused by fire attack or by mechanical damage to the insulation of the conductor. No additional evidence was available which would allow a determination that either fire attack or mechanical damage was the more likely cause of the electrical failure in the FD-HTR circuit.

5. Potential fire causes within the area of fire origin inside the top of the Ellis refrigerator are limited to failure of the FD-HTR heater circuit insulation due to mechanical damage sustained over years of use or ignition of combustible food storage containers close to, or in contact with, the internal light fixture. In either case, the fire was caused by a defect within the refrigerator.

This report and the opinions expressed herein are based on the currently available information and are subject to amendment and modification should additional information become available.

Submitted by:

Christoph J. Flaherty, P.E.
Electrical Engineer

# Appendix A

# Report Photographs

FEC Case No.: 1505 | A-2
**Ellis Residence Fire**

# Photograph 1

(Ferrese Scene Photo 384)



Area of fire in Ellis kitchen

FEC Case No.: 1505 | A-3
**Ellis Residence Fire**

# Photograph 2

### (Ferrese Scene Photo 414)



Refrigerator and range power cords

# Photograph 3

(Ferrese Scene Photo 467)



Unused green extension cord plugged in behind range

# Photograph 4

(Ferrese Scene Photo 127)



Refrigerator interior

FEC Case No.: 1505 | A-6
**Ellis Residence Fire**

# Photograph 5

(Ferrese Scene Photo 136)



Refrigerator interior, path of wiring harness and light fixture remnant indicated

FEC Case No.: 1505 | A-7
**Ellis Residence Fire**

# Photograph 6

(Ferrese Exam Photo 57)



Routing of wiring harness

# Photograph 7

(Ferrese Exam Photo 95)



Routing of wiring harness

FEC Case No.: 1505 | A-9
**Ellis Residence Fire** |

# Photograph 8

### (Ferrese Exam Photo 98)



Routing of wiring harness

FEC Case No.: 1505 | A-10
**Ellis Residence Fire** |

# Photograph 9

(Ferrese Exam Photo 177)



Examination of wiring harness, area of arcing indicated

# Photograph 10

### (Ferrese Exam Photo 180)



Examination of wiring harness, area of arcing indicated

# Photograph 11

### (Ferrese Exam Photo 185)



Arcing on wiring harness conductor

# Photograph 12

(Ferrese Exam Photo 407)



Range control wiring, left side

# Photograph 13

### (Ferrese Exam Photo 403)



Range control/display board, left side

FEC Case No.:  1505 | A-15
**Ellis Residence Fire**

# Photograph 14

(Ferrese Exam Photo 400)



Range control/display board, right side

FEC Case No.:  1505 | A-16
**Ellis Residence Fire**

# Photograph 15

(Ferrese Exam Photo 397)



Range control wiring, right side

# Photograph 16

(Case Photo 47)



Damage to range

FEC Case No.: 1505 | A-18
**Ellis Residence Fire** |

# Photograph 17

### (Case Photo 44)



Damage to range

FEC Case No.: 1505 | A-19
**Ellis Residence Fire** |

# Photograph 18
### (Case Photo 352)



Refrigerator damage

FEC Case No.: 1505 | A-20
**Ellis Residence Fire**

# Photograph 19

(Case Photo 373)



Refrigerator damage

FEC Case No.: 1505 | A-21
**Ellis Residence Fire**

# Photograph 20

(Case Photo 285)



Arcing on refrigerator wiring harness conductors

FEC Case No.: 1505 | A-22
**Ellis Residence Fire**

# Photograph 21

### (Case Photo 292)



Arcing on refrigerator wiring harness conductors

FEC Case No.:  1505 | A-23
**Ellis Residence Fire** |

# Photograph 22

(Case Photo 288)



Arcing on refrigerator wiring harness conductors

FEC Case No.: 1505 | A-24
**Ellis Residence Fire**

# Photograph 23
### (Case Photo 294)



Arcing on refrigerator wiring harness conductors

FEC Case No.: 1505 | A-25
Ellis Residence Fire |

# Photograph 24

(Case Photo 401)



Tracing arced wire to brown conductor on connector "CON2"

# Photograph 25

### (Case Photo 406)



Arced wire traced to pin marked "FD-HTR"

FEC Case No.: 1505 | A-27
**Ellis Residence Fire** |

# Photograph 26

(Case Photo 412)



Tracing arced wire

FEC Case No.: 1505 | A-28
**Ellis Residence Fire**

# Photograph 27

### (Case Photo 352)



Area of wiring harness electrical failure (seen from back of refrigerator)

# Photograph 28

(Case Photo 383)



Area of wiring harness electrical failure

FEC Case No.: 1505 | A-30
**Ellis Residence Fire**

# Photograph 29

(Ferrese Scene Photo 384)



Routing of wiring harness and location of failure indicated on scene photo

# Flaherty Engineering Consulting

## CURRICULUM VITAE – CHRISTOPH J. FLAHERTY, P.E.

www.flahertyengineering.net | 410.541.6466

### Academic Background

M.S., Electrical Engineering, Tufts University, 1994
B.S., Physics, United States Naval Academy, 1992
Certified Fire and Explosion Investigation Program, National Association of Fire Investigators, 2004

### Registration and Qualifications

Licensed Professional Engineer in Maryland, Virginia, Pennsylvania, and the District of Columbia
Certified Fire and Explosion Investigator, National Association of Fire Investigators (2004-2017)
Naval Nuclear Propulsion Engineer

### Professional Experience

Senior Electrical Engineer, Flaherty Engineering Consulting, LLC, 2009-present
Consulting Electrical Engineer, FORCON International, 2012-present
Consulting Electrical Engineer, Rothfuss Engineering Company, 2014-2019
Consulting Electrical Engineer, RTI Forsensics, 2013-2019
Electrical Engineering Faculty, United States Naval Academy, 2006-2012
    Courses/subjects taught: Electrical Circuits, Power Generation and Distribution, Electrical Motors, Power Supply Design, Fiber Optical Communications, Signals and Systems
Consulting Electrical Engineer, CED Investigative Technologies, Inc., 2006-2012
Senior Electrical Engineer, CED Investigative Technologies, Inc., 2003-2005
Optical Engineer/Laser Safety Officer, Lumera, Inc., 2001-2003
Nuclear Propulsion Plant Engineering Instructor, Trident Training Facility, 1999-2001
Strategic Missile Officer and Quality Assurance Director, USS Florida (SSBN 728), 1997-1999
Shift Maintenance Coordinator and Engineering Watch Officer, USS Florida (SSBN 728), 1996-1999
Naval Nuclear Propulsion and Submarine Training, United States Navy, 1994-1995

### Professional Societies

Institute of Electrical and Electronics Engineers (IEEE)
National Fire Protection Association (NFPA)
National Association of Fire Investigators (NAFI)

### Areas of Expertise

- Electrical consumer products including appliances, tools, computers, extension cords, and surge protectors
- Electrically ignited fires
- Electrical grounding and electrical shock
- Electrical commercial and industrial equipment including electric motor operated pumps, fans, and HVAC units
- Electrical power generation and distribution, including switchgear design, installation, and maintenance
- Residential and commercial building wiring
- Electrical control systems
- Conduct of work on electrical systems, including lockout/tagout procedures and other OSHA requirements

**EXHIBIT**

tabbies

Flaherty-2

01/07/21    JEB

# Flaherty Engineering Consulting

## 2020 RATES AND POLICIES

Christoph Flaherty's 2020 consulting rate is $290/hr for all standard services including travel, inspection, research, document review, and testimony. This rate also includes use of standard investigation and testing tools (digital photography and videography, measurement and power tools). Work in potentially asbestos-contaminated environments (which Christoph Flaherty is certified to do) will be billed at $345/hr. Additional fees, such as those for use of specialized equipment and laboratory space, will be agreed upon and billed at cost.

All expenses incurred for travel (such as air fare, car rental, lodging, meals, tolls, and parking) will be billed at cost. Personal vehicle travel is billed at the government reimbursable rate (currently $0.575/mile).

Evidence storage is also offered and billed according to size and nature of evidence. Storage rates generally range from $25 to $100 per month.

**Expert Testimony Given by Christoph J. Flaherty, P.E.**

| Date | Case and Court | Attorney Client | On Behalf Of |
|------|----------------|-----------------|--------------|
| 12/10/2003 Deposition | Jeffery Johnston and Filomena Piccolino Johnston v. The Narragansett Electric Company, et al. v. L.M.A.C., LLC | Paul V. Reynolds | L.M.A.C, LLC |
| 5/20/2004 Deposition | Erik Kwakwyei v. The Variety Mart, Inc., et al. in the Circuit Court of the City of Alexandria (CL030303) | R. Craig Jennings | Erik Kwakwyei |
| 6/1/2004 Deposition | Geoffrey Manifold v. Wolf Coach, Inc., et al., v. James E. Forner, et al. in the U.S. District Court for the District of the District of Columbia (1:1CV01114 and 1:02CV01153) | Brian E. Hoffman | Wolf Coach, Inc. |
| 9/14/2004 Deposition | PAS-Com, Inc. v. Allied Products, Inc., et al. in the Circuit Court for Montgomery County, Maryland (241709-V) | Walter L. Williams | Applica Durable Manufacturing, Ltd. |
| 4/5/2005 Deposition | Hartford Insurance Company of the Midwest, subrogee of Tabor Auto Service v. Belkin-Components, et al. | Daniel J. Hart | Belkin Components |
| 12/8/2005 Deposition | Allstate Insurance Company, subrogee of Daniel Tam v. A. O. Smith Corporation, et al. in the Circuit Court for Montgomery County (259865V) | Winn Friddell | Allstate Insurance |
| 7/7/2006 Deposition | Walter Wilson v. Washington Metropolitan Area Transit Authority in th U.S. District Court for the District of the District of Columbia (1:03CV01931) | Allen Hilliard Legum | Walter Wilson |
| 12/1/2006 Deposition | Larry Dean Murphy v. Astorg Ford & Hunter Engineering Co. in the Circuit Court of Wood County, West Virginia (05-C-88) | Susan Curry Brasselle | Larry Dean Murphy |
| 12/13/2006 Deposition | Hartford Fire Insurance Co., subrogee of Simsbury Pediatric & Adolescent Dentistry v. AFP Imaging Corp., Dent-X International, & Sullivan-Schein Dental Sales & Services in the U.S. District Court for the District of Connecticut (3:05CV01019) | Jeffrey C. Pingpank | Sullivan-Schein Dental Sales & Services |
| 1/23/2007 Deposition | Security Square Associates, et al. v. Richard Wood, et al. in the Circuit Court for Baltimore County (C-04-12745) | William N. Zifchak | Dennis Dodsworth |
| 3/30/2007 Deposition | Allstate Insurance Company, subrogee of Quinton Wilson v. Kolb Electric, Inc. in the Circuit Court for Prince George's County (CAL06-08082) | Charles Fratus | Allstate Insurance |
| 5/16/2007 Trial | Kendra Brooks, et al. v. District of Columbia Housing Authority in the Superior Court of the District of Columbia (CA No. 05-0654) | Michael Hicks and Dawn Singleton | DC Housing Authority |
| 6/11/2007 Deposition | Betty Bell, et al. v. Zenith Electronics Corporation, et al. in the Circuit Court for Baltimore County (03-C-05-010401) | Dan Lanier and Steve Kelly | Circuit City |



**EXHIBIT**

tabbies Flaherty-3

01/07/21          JEB

Flaherty Testimony, Cont. (Page 2)

| Date | Case and Court | Attorney Client | On Behalf Of |
|------|----------------|-----------------|--------------|
| 4/28/2008 Deposition | Religious and Charitable Risk Pooling Trust of the Brothers of the Christian Schools and Affiliates, a/s/o St. John's College High School v. Belkin International, Inc., et al. in the Superior Court of the District of Columbia (2007CA001112B) | Juliane C. Miller | Belkin International |
| 11/19/2008 Deposition | Schwartz v. Invacare Corporation, et al. in the Superior Court of New Jersey, Bergen County (L-5819-06) | John E. Lamastra | Chubb Insurance a/s/o Martin Schwartz |
| 6/25/2009 Trial | Schwartz v. Invacare Corporation, et al. in the Superior Court of New Jersey, Bergen County (L-5819-06) | John E. Lamastra | Chubb Insurance a/s/o Martin Schwartz |
| 12/22/2010 Deposition | Richard J. Edwards v. Hi-Tech Electric, LLC, et al. in the Superior Court of the District of Columbia (2009CA006244B) | Julia Haller | Hi-Tech Electric |
| 6/20/2011 Deposition | Charles Casey and Jeannette Casey v. The Geek Squad Subsidiary, Best Buy Stores, L.P. in the United States District Court for the District of Maryland (PWG-10-CV-2268) | Christopher R. Dunn | Best Buy |
| 3/13/2012 Arbitration | James Hockenbury and Jennifer Hockenbury v. Friends of Paul's Run and PECO Energy and Square D Company in the Court of Common Pleas Philadelphia County (September 2009 term, No. 1333) | Peter A. Callahan | Friends of Paul's Run |
| 3/14/2012 Deposition | Shipwright Harbor Marina, Inc. v. Victor Hastings, et al. in the Circuit Court for Anne Arundel County (C11-161850) | Ronald A. Baradel | Shipwright Harbor Marina |
| 6/18/2014 Deposition | Allstate Insurance Company a/s/o Audoersch, et al. v. NVR, Inc. t/a NV Homes and/or Ryan Homes and Hilltop Electric Company in the Circuit Court for Baltimore County (03-C-13-003852, 53, and 55) | Edward W. Brady | Allstate Insurance a/s/o Audoersch, et al. |
| 12/3/2014 Deposition | Cumberland Insurance Group a/s/o David Wickwire v. Delmarva Power in the Circuit Court for Dorchester County Maryland (09-C-13-020765) | Lisa C. McLaughlin | Delmarva Power |
| 12/9/2014 Hearing | Catherine Hockenberry, Clinton L. Hockenberry v. William S. Ward III in Magisterial District Court 19-3-10, Dillsburg, Pennsylvania (MJ-19310-CV-0000170-2014) | Charles Young | Erie Insurance as carrier for William S. Ward III |
| 5/5/2016 Deposition | Allstate Insurance Company a/s/o Stanley Nutt v. Washington Home Doctors, Inc. in the Circuit Court for Prince George's County (CAL15-18259) | Charles Fratus | Allstate Insurance a/s/o Stanley Nutt |
| 5/17/2016 Deposition | HDI Gerling America Insurance Company v. Worth & Company, Inc. v. Malco Electric, Inc. in the United States District Court for the District of New Jersey (14-3614) | Lee Eckell | Worth & Company, Inc. |

Flaherty Testimony, Cont. (Page 3)

| Date | Case and Court | Attorney Client | On Behalf Of |
|---|---|---|---|
| 3/1/2017 Deposition | Desheria Gaines v. 2 Smart Communications LLC in the Circuit Court of Maryland for Baltimore County (24-C-16-002216) | Dan Whitney | Desheria Gaines |
| 4/5/2017 Deposition | Amica Mutual Insurance Company a/s/o Jerry Pfeffer, et al. v. Tuchers Air Conditioning & Heating, LLC in the Circuit Court for Montgomery County (423965-V) | Larissa Byers | Tuckers Air Conditioning & Heating, LLC |
| 4/21/2017 Deposition | Eser Ozdeger, et al. v. A/R Electrical Solutions, Inc. in the Circuit Court for Montgomery County, Mayland (422731-V) | David Rubino | Macon Construction |
| 7/6/2017 Trial | Desheria Gaines v. 2 Smart Communications LLC in the Circuit Court of Maryland for Baltimore County (24-C-16-002216) | Dan Whitney | Desheria Gaines |
| 11/15/2017 Deposition | Sentinel Insurance Co., et al. v. Unilever United States, Inc., et al. and Quaj Enterprises Inc., et al. v. Unilever United States, Inc., et al. in the Superior Court for the District of Columbia (2015 CA 007536 B and 2016 CA 001808 B) | Gus Sara | Yonas, Inc. (one of the plaintiffs) |
| 11/29/2017 Deposition | The Harford Mutual Ins. Co. v. Mona Electric Group in the Circuit Court for Maryland for Prince George's County (CAL17-07976) | Diane Moir | The Harford Mutual Ins. Co. |
| 1/5/2018 Deposition | Todd Levine v. GBG, Inc. t/a Gold's Gym in the Circuit Court for Montgomery County, Maryland (419811-V) | Robert Ferguson | Gold's Gym |
| 2/22/2018 Trial | Todd Levine v. GBG, Inc. t/a Gold's Gym in the Circuit Court for Montgomery County, Maryland (419811-V) | Robert Ferguson | Gold's Gym |
| 6/26/2018 De Bene Esse Deposition | The Harford Mutual Ins. Co. v. Mona Electric Group in the Circuit Court for Maryland for Prince George's County (CAL17-07976) | Diane Moir | The Harford Mutual Ins. Co. |
| 6/27/2018 Deposition | James Brown, et al. v. Hamilton Beach Brands, Inc. in the Circuit Court for Anne Arundel County (C-02-CV-17-003173) | Charles Fratus | Allstate Insurance (James Brown) |
| 8/14/2018 Deposition | Nationwide Mutual Fire Insurance Company a/s/o Orest Lasuk v. Honeywell International, Inc., et al. in the Circuit Court for Anne Arundel County (C-02-CV-18-000017) | Kristen Dorsey | Nationwide (Lasuk) |
| 10/24/2018 Trial | Harry Workman v. Axalta Coating Systems in the United States District Court for the Western District of Virginia (5:17cv00108) | James Liskow | Axalta Coating Systems |
| 2/15/2019 Deposition | State Auto Property and Casualty Insurance Company v. Kim Eagan Woods in the United States District Court for the Middle District of Pennsylvania (Civil No. 4:17-02099-MWB) | Gary L. Weber | Kim Eagan Woods |
| 6/11/2019 Deposition | Wright, et al. v. Ace Hardware Corp., et al. in the Circuit Court for Kent County Maryland (C-14-CV-17-000044) | Tamara B. Goorevitz | Ace Hardware |

Flaherty Testimony, Cont. (Page 4)

| Date | Case and Court | Attorney Client | On Behalf Of |
|------|----------------|-----------------|--------------|
| 9/13/2019 Deposition | XL Specially Insurance Co. v. Jeanneau America, Inc. et al. in the United States District Court for the District of Maryland (Civil Action No. 1:18-cv-2703) | Christopher M. Schierloh | XL Specialty Insurance |
| 9/30/2020 Deposition | Greg Subiszak, et al: v. Aztec Motel and Marsden and Sons Electric in the Superior Court of New Jersey, Cape May County (L-000558-17) | Jared K. Levy | Aztec Motel |
| 10/1/2020 Deposition | Robert Ritchie, Jr. v. Baltimore Gas and Electric Company and Middle River Station Development in the Circuit Court for Baltimore City (24-C-19-004533 | Jason Foltin | BGE |



**EXHIBIT**

Flaherty-4

01/07/21                    JEB

RETAINED BY COUNSEL.

B



L

R

F



EXHIBIT

Flaherty-6

01/07/21                    JEB